857 F.2d 122
 UNITED STATES of America, Appellant in 87-1756 and
Petitioner in 88-5143,
v.
Angelita MARTINEZ-ZAYAS a/k/a "Carmen Lopez", Appellant in
87-1749 and Respondent in 88-5143,
The Honorable Clarence C. Newcomer, Nominal Respondent in 88-5143.
 Nos. 87-1749, 87-1756 and 88-5143.
 United States Court of Appeals,
Third Circuit.
 Argued July 13, 1988.
Decided Aug. 31, 1988.
 
 Jeffrey L. Staniels (argued), Defender Association of Philadelphia, Federal Courts Div., Philadelphia, Pa., for appellant-cross-appellee, Angelita Martinez-Zayas.
 Frederick G. Herold (argued), U.S. Atty. Office, Philadelphia, Pa., for appellee-cross-appellant, U.S.
 Before SLOVITER, SCIRICA and WEIS, Circuit Judges.
 OPINION OF THE COURT
 SCIRICA, Circuit Judge.
 
 
 1
 When it enacted the Anti-Drug Abuse Act of 1986, Congress provided that any person convicted of an offense under 21 U.S.C. Sec. 841(a) (1982) involving more than five kilograms of cocaine "shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life ..." without parole. See id. Sec. 841(b)(1)(A) (1986 Supp.). Cross-appellant Angelita Martinez-Zayas was convicted of possession with intent to distribute twelve kilograms of cocaine, a violation of Sec. 841(a). The district court determined that although Martinez-Zayas fell within the coverage of Sec. 841(b)(1)(A), "it is clear from the legislative record that Congress did not intend that someone in Ms. Martinez-Zayas' position receive a mandatory 10 year jail term sentence without parole," because she was a middle-level dealer, and not a " 'kingpin.' " J.A. at 36, 38-39. Therefore, the court imposed a five-year term of imprisonment without parole. Id. at 39 (citing Sec. 841(b)(1)(B)(ii)).
 
 
 2
 The government appeals, maintaining that the sentence violates the clear congressional mandate requiring mandatory ten-year prison terms for defendants convicted of offenses involving large quantities of illegal narcotics. Our review of the district court's interpretation of Sec. 841(b) is plenary, see Government of the Virgin Islands v. Douglas, 812 F.2d 822, 832 (3d Cir.1987); Chrysler Credit Corp. v. First Nat. Bank & Trust Co. of Washington, 746 F.2d 200, 202 (3d Cir.1984), and for reasons that follow, we will direct the district court to vacate its five-year sentence and to resentence Martinez-Zayas consistent with Sec. 841(b)(1)(A).
 
 
 3
 In her cross appeal, Martinez-Zayas contends the district court erred by not suppressing the cocaine seized during the government search. First, she claims the government improperly searched her purse when the search warrant authorized only a search of her house. Second, she contends that the warrant violated Fed.R.Crim.P. 41(a) because it was issued by a non-lawyer bail commissioner in Philadelphia Municipal Court, and not by a "federal magistrate or a judge of a state court of record...." Id.
 
 
 4
 For reasons that follow, we will affirm the district court on these issues. We hold that the warrant authorized government agents to search Martinez-Zayas' purse. In addition, we find that Martinez-Zayas failed to raise her Rule 41 claim before the district court. Even assuming the government violated Rule 41, its conduct did not rise to the level of plain error sufficient to justify suppression in this case. See Fed.R.Crim.P. 52.I.
 
 
 5
 Martinez-Zayas was convicted of violating Sec. 841(a) (possession with intent to distribute cocaine) and 21 U.S.C. Sec. 856 (maintaining a building for purposes of storing a controlled substance) based on evidence seized pursuant to a joint undertaking of the federal Drug Enforcement Administration ("DEA") and the Philadelphia Police Department. On November 3, 1986, DEA Agent Richard Fekete learned from an informant that a large shipment of cocaine was scheduled for delivery by associates of Angel Hernandez, a suspected drug dealer, to 517 West Butler Street. Agent Fekete relayed this information to Philadelphia Police Officer Michael McCue. The two jointly drafted a search warrant, and McCue obtained authorization from a Philadelphia Municipal Court bail commissioner to execute the warrant. The warrant authorized a search of 517 Butler Street for cocaine, various other illegal drugs, and for "any proof of residency or occupancy and all fruits of the crime including narcotics proceeds and paraphernalia." J.A. 64.
 
 
 6
 Upon reaching the scene, federal agents and police saw Martinez-Zayas enter 517 Butler Street carrying a purse. After entering the house and producing the warrant, agents searched for other occupants and then asked Martinez-Zayas her name, where she was born and who resided in the house. She gave the name Angelita Martinez, said she had been born in Puerto Rico, but did not respond as to who resided in the house. Agent Fekete searched Martinez-Zayas' purse--located about four feet away from her--for identification. He found two identification cards and four plastic bags containing more than six grams of eighty-six percent pure cocaine, and arrested Martinez-Zayas.
 
 
 7
 Shortly thereafter, agents discovered large quantities of drug-cutting substances, "hundreds, if not thousands" of clear plastic bags, J.A. at 404-05, eight rolls of colored tape,[1] and other drug paraphernalia in plain view in the basement. Agent Fekete also found more than twelve kilograms of eighty-six percent pure cocaine in a chamber carved out under the floor in a second-floor bedroom. In addition, agents seized documents in another bedroom identifying Martinez-Zayas as the owner of the premises, and other records indicating that Angel Hernandez was the father of her two children.
 
 
 8
 The district court denied a motion to suppress the twelve kilograms of cocaine, holding that the warrant was supported by probable cause under the standard set forth in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). See J.A. at 16. In denying the motion to suppress, the court noted that the warrant had been issued by a non-lawyer bail commissioner. Id. at 16-17 n. 1 ("Defendant seems to imply that because the warrant was issued by a bail commissioner and not a federal magistrate or state judge, the finding of probable cause must be subjected to some heightened scrutiny."); accord J.A. at 46 (Defendant's Motion to Suppress). Martinez-Zayas, however, never raised the possibility of a Rule 41 violation. The court simply observed that warrants issued by bail commissioners are not subject to heightened scrutiny because bail commissioners: (1) attend a training course; and (2) are qualified to make practical, non-technical probable cause determinations. J.A. at 17 n. 1.
 
 
 9
 Martinez-Zayas then filed a supplemental motion to suppress, contesting the search of her purse. After a suppression hearing, the court ruled:
 
 
 10
 I am ... satisfied that in finding this defendant inside under these circumstances ... [the government was] justified in searching through her pocketbook which was in her immediate vicinity. And under the outstanding law that this court is familiar with, they would have the right to check that pocketbook.
 
 
 11
 J.A. at 286-87.
 
 
 12
 At trial, the parties stipulated that the amount of cocaine seized from MartinezZayas' purse and from her house amounted to more than twelve kilograms. J.A. at 522-23. The jury convicted Martinez-Zayas of possession with intent to distribute cocaine, Sec. 841(a), and maintaining a building for the purpose of storing cocaine, Sec. 856. At sentencing, the district court ruled that Martinez-Zayas should not be subject to the ten-year mandatory minimum sentence for individuals convicted under Sec. 841(a), even though her case involved twelve kilograms of cocaine--more than twice the amount set forth as triggering the ten-year sentence. First, the court noted:
 
 
 13
 It is no secret ... that one reason that law enforcement officials pursued the defendant was to obtain defendant's cooperation in the ongoing investigation of the alleged drug dealings of Ms. Martinez-Zayas' boyfriend, Mr. Angel Hernandez. It is this man, which evidence indicates is the father of the defendant's children, that police believe to be a major cocaine distributor in Philadelphia.
 
 
 14
 J.A. at 29. The court also observed that Martinez-Zayas was a welfare recipient "who appears to subsist from hand to mouth," and that she had refused to plea bargain or to cooperate in the investigation of Hernandez. Id. at 30.
 
 
 15
 Acknowledging that Sec. 841(b)(1)(A) "simply requires 10 years of jail time for the conviction of possession in excess of 5 kilograms of cocaine," the court nevertheless concluded that the legislative history of Sec. 841(b) demonstrates a congressional desire to target only drug kingpins or masterminds. Martinez-Zayas, the court determined, fit neither description, and therefore was not covered by the ten-year provision. J.A. at 30, 35. Because Martinez-Zayas "did have a role in the [drug] distribution network," J.A. at 38, however, the court sentenced her under Sec. 841(b)(1)(B)(ii) as a "middle-level" drug dealer to the mandatory five-year prison term without parole.
 
 II.
 
 16
 As a threshold matter, we must determine whether the district court's sentence in this case is an order subject to appellate review. If the order is not appealable our "inquiry is over," because we lack jurisdiction. Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 379, 101 S.Ct. 669, 676, 66 L.Ed.2d 571 (1981). The government asserts two bases enabling us to review Martinez-Zayas' sentence. First, it contends that this case is governed by 18 U.S.C. Sec. 3742(b)(1) (1986 Supp.), which expressly confers appellate jurisdiction over government appeals "if the sentence was imposed in violation of law." See Sec. 3742(b)(1). Second, the government maintains that if we hold Sec. 3742 inapplicable, we should grant its petition for a writ of mandamus. See United States v. Ferri, 686 F.2d 147, 152 (3d Cir.1982), cert. denied, 459 U.S. 1211, 103 S.Ct. 1205, 75 L.Ed.2d 446 (1983).
 
 
 17
 The government's reliance on Sec. 3742 is misplaced. Martinez-Zayas committed the underlying offense November 1, 1986, and was sentenced November 19, 1987. Congress determined that Sec. 3742 and the other provisions in its new sentencing law would be effective November 1, 1987. Thus, the government argues, because the sentence was imposed after the statute's effective date, Sec. 3742 grants appellate review. This reading, however, fails to resolve the question whether Congress intended the statute to apply in cases where the offense was committed before the statute's effective date, but the defendant was sentenced after the effective date.
 
 
 18
 The parties both claim support from a Senate Judiciary Committee report stating: (1) preexisting law will apply to "all substantive matters" for offenses committed before the effective date; but (2) the statute's "procedural and administrative provisions" will apply if a sentence is imposed on or after the effective date "for an offense committed before the effective date." S.Rep. No. 98-225, 98th Cong., 1st Sess. (1984), reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3372. Although this passage could be read as supporting either parties' position, we need not decide this issue based on an ambiguous fragment of legislative history.
 
 
 19
 Shortly after sentence was imposed in this case, Congress clarified its intent on application of the statute for offenses committed before the effective date. On December 7, 1987, Congress amended the effective date of its sentencing scheme to include the words "and shall apply only to offenses committed after the taking effect of this chapter." Sentencing Act of 1987, Pub.L. No. 100-182, Sec. 2, 101 Stat. 1266, 1266 (1987).[2]
 
 
 20
 Although this congressional amendment was enacted eighteen days after the sentence imposed here, its explicit language indicates Congress intended Sec. 3742 and the other provisions of its new sentencing law to apply only if the underlying offense was committed after November 1, 1987. In the absence of any other unambiguous indicia of congressional intent, we rely on the December, 1987 amendment. Because the offense was committed before the effective date of Sec. 3742, that provision does not confer jurisdiction for us to consider the government's appeal.
 
 
 21
 Nevertheless, under the All Writs Act, 28 U.S.C. Sec. 1651 (1982), we are empowered to issue a writ of mandamus in extraordinary cases. Douglas, 812 F.2d at 832; Ferri, 686 F.2d at 152. We have discretion to grant the writ if: (1) no other adequate means to attain the desired relief exists; and (2) the district court committed a clear error of law. Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1118 (3d Cir.1986). Because Sec. 3742 fails to confer jurisdiction in this case, the government has "no other path to appellate review." Id. We must therefore determine whether the district court's construction and application of Sec. 841(b) constituted clear error.
 
 
 22
 Although a sentence imposed within statutory limits is not subject to review, United States v. Tucker, 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972), a sentence that varies from a statute's mandate is not entitled to similar safeguards. Whether a district court has jurisdiction to reduce a sentence, see Ferri, 686 F.2d at 152, and whether the district court possessed authority to impose a particular sentence, Douglas, 812 F.2d at 832, both fall "within the narrow range of cases in which mandamus may be appropriate." Id.; see Ex parte United States, 242 U.S. 27, 42, 37 S.Ct. 72, 74, 61 L.Ed. 129 (1916) (mandamus would be appropriate if court refused to impose a sentence mandated by law). To prove that the district court committed clear error of law, the government must establish that its right to the writ is " 'clear and indisputable.' " Douglas, 812 F.2d at 832; Ferri, 686 F.2d at 152 (quoting Kerr v. United States District Court, 426 U.S. 394, 403, 96 S.Ct. 2119, 2124, 48 L.Ed.2d 725 (1976)). Only then can we "confine an inferior court to a lawful exercise of its prescribed jurisdiction or ... compel it to exercise its authority when it is its duty to do so." Kerr, 426 U.S. at 402, 96 S.Ct. at 2123 (quoting Will v. United States, 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305 (1967) (quoting Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943))).
 
 
 23
 As the court entertaining the mandamus petition, we must construe the relevant statute to determine whether the district court has a clear and indisputable nondiscretionary duty to perform the specified action. Douglas, 812 F.2d at 832 & n. 10. Thus, mandamus is appropriate only if the district court was duty-bound by Sec. 841(b) to sentence Martinez-Zayas to a mandatory ten-year prison term without parole. That issue, of course, is the question presented in this appeal.
 
 III.
 Section 841(b)(1)(A) provides:
 
 24
 Except as otherwise provided in section 845, 845a, or 845b of this title, any person who violates subsection (a) of this section shall be sentenced as follows:(1)(A) In the case of a violation of subsection (a) of this section involving--
 
 
 25
 (ii) 5 kilograms or more of a mixture or substance containing a detectable amount of--
 
 
 26
 (II) cocaine, its salts, optical and geometric isomers, and salts of isomers;
 
 
 27
 such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life.... Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph. No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.
 
 
 28
 Id. Section 841(b)(1)(B)(ii)(II), meanwhile, provides that in the case of a violation involving 500 grams or more of cocaine "such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years" without the possibility of probation, suspended sentence, or parole. Id.
 
 
 29
 The government maintains that, given the amount of cocaine involved here, the district court violated a "clear and indisputable legal duty" by sentencing Martinez-Zayas to a five-year term of imprisonment pursuant to Sec. 841(b)(1)(B), instead of the ten-year minimum term under Sec. 841(b)(1)(A). Congress, the government argues, expressly withdrew sentencing discretion from district judges in certain cases involving specified amounts of drugs. Martinez-Zayas raises several arguments in support of the district court's interpretation of Sec. 841(b).[3]
 
 
 30
 First, and most importantly, Martinez-Zayas maintains that the legislative history accompanying Sec. 841(b) demonstrates that Congress did not intend to impose a mandatory ten-year prison term in every case. This is the view adopted by the district court.
 
 
 31
 Our examination of the statutory language of Sec. 841(b)(1)(A), however, reveals no ambiguity. The statute states that "any person" who violates Sec. 841(a) "shall be sentenced as follows...." Sec. 841(b). In cases involving more than five kilograms of cocaine "such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life...." Id. We cannot envision how Congress could have more clearly expressed its intent.
 
 
 32
 This case, therefore, is different from Douglas, 812 F.2d at 832-33, a case in which we denied mandamus with respect a district court's sentencing duty. In Douglas, the legislature also used the mandatory "shall" directive in a sentencing statute, but we determined that another clause in the statute ("in addition to") created an ambiguity on whether the sentence should run consecutively or concurrently. Accordingly, we held that the statute did not require that the sentencing court impose consecutive sentences. Id. In this case, Congress' message is clear: if the defendant is convicted in a case involving five or more kilograms, the court "shall" impose a ten-year mandatory minimum sentence. Depending on the circumstances of the case, the prison sentence could be for as long as life.
 
 
 33
 Moreover, the only statutory exceptions in Sec. 841(b) refer to Secs. 845, 845a, and 845b, which authorize the sentencing court to double the penalties imposed under Sec. 841(b) for first-time offenders and to triple the penalties for second-time offenders of statutes prohibiting: (1) distributing controlled substances to persons under the age of twenty-one, Sec. 845; (2) distributing or manufacturing controlled substances in or near schools or colleges, Sec. 845a; and (3) employing persons under the age of eighteen to violate federal drug laws, Sec. 845b. Thus, when Congress opted to give the sentencing court discretion to depart from the mandate of Sec. 841(b), it did so only to permit the court to enhance the minimum penalty, not to reduce it. These exceptions demonstrate the conviction of Congress to ensure incarceration for certain types of drug dealers.
 
 
 34
 The government contends that our inquiry is complete upon finding the statute unambiguous. That view, however, short circuits our task and oversimplifies the precedent of this court and the Supreme Court. Even when the statutory language is unambiguous, "legislative history of the statute justifies departure from the plain words of a statute" in those "rare and exceptional circumstances" when the moving party demonstrates a "clearly expressed legislative intention to the contrary." United States v. James, 478 U.S. 597, 606, 106 S.Ct. 3116, 3122, 92 L.Ed.2d 483 (1986) (quoting Rubin v. United States, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981); Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)); see also Burlington Northern R.R. Co. v. Oklahoma Tax Comm'n, 481 U.S. 454, 107 S.Ct. 1855, 1859-60, 95 L.Ed.2d 404 (1987); I.N.S. v. Cardoza Fonseca, 480 U.S. 421, 107 S.Ct. 1207, 1213 & n. 12, 94 L.Ed.2d 434 (1987).
 
 
 35
 Although we should not permit overemphasis on legislative history to distort a clear statutory purpose, we are bound to scrutinize "the relevant utterances of a co-ordinate branch of our government ... for whatever assistance they may afford." Paskel v. Heckler, 768 F.2d 540, 543 (3d Cir.1985); accord Brock v. Richland Shoe Co., 799 F.2d 80, 83 (3d Cir.1986), aff'd on other grounds sub nom. McLaughlin v. Richland Shoe Co., --- U.S. ----, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). Our inquiry, however, is circumscribed, and we must bear in mind that "Congressmen typically vote on the language of a bill," not on isolated remarks of individual lawmakers or other indicia of legislative history. See United States v. Locke, 471 U.S. 84, 95-96, 105 S.Ct. 1785, 1792-93, 83 L.Ed.2d 64 (1985); accord Schweggman Bros. v. Calvert Corp., 341 U.S. 384, 396, 71 S.Ct. 745, 751, 95 L.Ed. 1035 (1951) (Jackson, J., concurring) ("It is the business of Congress to sum up its own debate in its legislation.").
 
 
 36
 Martinez-Zayas maintains that Congress designed its mandatory sentencing scheme to ensure punishment of major drug dealers--so called "kingpins" or "masterminds." At trial, Martinez-Zayas portrayed herself as a working mother[4] of two children, struggling to stay above the poverty line. She maintained that her relationship with Angel Hernandez began before his involvement in drug dealing, and that although he retained a key to her house, he did not support her or her children, and she was not involved in, or familiar with, his drug operation. Moreover, she stated that she had no knowledge how twelve kilograms of cocaine entered her house, or how drug distribution paraphernalia found its way into her basement, where she regularly performed household chores. See generally J.A. at 539-70 (testimony of Martinez-Zayas). Although the jury apparently rejected this view of the evidence, the district court in part relied on some of it in determining that Martinez-Zayas was not the type of person targeted by Sec. 841(b)(1)(A).
 
 
 37
 We do not read the legislative history of Sec. 841(b) as constituting the type of clearly expressed legislative intent sufficient to justify departure from the plain and unambiguous words of the statute. See Burlington Northern, 107 S.Ct. at 1860. To be sure, various members of Congress used the words "kingpin" and "mastermind" in legislative debate of how Congress intended to toughen federal drug laws. See 132 Cong.Rec. 14288 (daily ed. September 30, 1986) ("major drug traffickers and kingpins") (Sen. Chiles); id. at 14289 ("kingpins of the drug syndicate who sell their poison to our children") (Sen. Biden); id. at 14301 ("the kingpins--the masterminds who are really running these [drug] operations") (Sen. Byrd); id. at 13779 (daily ed. September 26, 1986) ("the most serious drug traffickers, so-called 'drug kingpins', would face a mandatory minimum of 10 years and up to life imprisonment") (Senate section-by-section analysis). Yet, reliance on "isolated fragments of legislative history in divining the intent of Congress is an exercise fraught with hazard...." New England Power Co. v. New Hampshire, 455 U.S. 331, 342, 102 S.Ct. 1096, 1102, 71 L.Ed.2d 188 (1982). These isolated statements must be read in light of the statutory language and legislative history as a whole. See Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 220-21, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174 (1986).
 
 
 38
 During debate over the 1986 drug bill, Congress recognized the magnitude of the problem it faced. Senator Domenici stated that the use of illicit drugs "is clearly one of the biggest threats facing our society." Id. at 14282 (daily ed. September 30, 1986). Senator Lautenberg called the use and distribution of illegal drugs "a scourge in our society," id. at 14278, and Senator Kennedy termed drug abuse "a menace that threatens the security, health, and productivity of all or our citizens." Id. at 14281. Accordingly, Congress passed a far-reaching anti-drug bill. It targeted for punishment "major traffickers, the manufacturers, or the heads of organizations", explaining that those individuals were "responsible for creating and delivering very large quantities of drugs." See H.R.Rep. No. 99-845, 99th Cong., 2d Sess. 11-12 (1986) (Report of House Judiciary Committee). Congress designated drug quantity as the best means of identifying those individuals who should be subject to a "heightened sentence." See id. at 11. As the House Judiciary Committee explained:
 
 
 39
 After consulting with a number of DEA agents and prosecutors about the distribution patterns for these various drugs, the Committee selected quantities of drugs which if possessed by an individual would likely be indicative of operating at such a high level.... The quantity is based on the minimum quantity that might be controlled or directed by a trafficker in a high place in the processing and distribution chain....
 
 
 40
 Id. at 12.
 
 
 41
 In the Senate, Senator Byrd engaged in a comprehensive discussion of the statute's penalty provisions. First, he emphasized the importance of the mandatory minimum sentences. "[W]e have to make sure that the would-be criminal knows that if he commits a crime and gets caught, his punishment will be sure and certain.... [T]he laws we pass will henceforth make it abundantly clear that a jail term must be be imposed and a jail term must be served." 132 Cong.Rec. 14301 (daily ed. September 30, 1986). For certain crimes involving drugs, Senator Byrd explained, sentencing "will not be a matter of the judge's discretion." Id. Second, and most importantly, he noted, "kingpins and masterminds" will be subject to ten-year minimum jail terms, and those individuals will be "identified by the amount of drugs with which they are involved." Id.
 
 
 42
 This emphasis on quantity as the key factor triggering the statute's mandatory sentencing provision was adopted by Congress in the language of Sec. 841(b). In that provision, Congress decided to mandate minimum prison terms without parole based solely on the quantity of drugs involved in the Sec. 841(a) conviction. See Sec. 841(b); accord Wisotsky, Crackdown: The Emerging "Drug Exception" to the Bill of Rights, 38 Hastings L.J. 889, 904 (1987) ("The bill that finally became law casts a wide net.... Among other things, it imposes some of the severest penalties in the United State Code, including mandatory minimum prison sentences.... [T]he Act provides minimum penalties of five and ten years in prison depending upon drug and weight involved....") Thus, to the extent Martinez-Zayas contends that Sec. 841(b) was aimed at major drug dealers, i.e., "so-called kingpins," she is correct. Based on the quantity of drugs in her case, however, Congress explicitly placed her in that category, and therefore directed the sentencing court to impose a mandatory prison term. Rather than conflicting with the statutory language, see Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984) (conflict between legislative history and plain meaning of statute must be "most extraordinary"), we conclude that the legislative history of Sec. 841(b) supports it.
 
 IV.
 
 43
 Martinez-Zayas raises two other arguments in support of her claim that she is not subject to the ten-year mandatory prison term. First, she maintains that pursuant to United States v. Gibbs, 813 F.2d 596 (3d Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987), facts triggering applicability of a mandatory penalty are sentencing facts and not elements of the offense. Therefore, she argues, the sentencing judge must determine factors not established by the jury verdict, and that determination is discretionary and not subject to mandamus. We disagree.
 
 
 44
 In this case, the parties stipulated that the amount of cocaine involved in Martinez-Zayas' case totalled twelve kilograms. J.A. at 522-23. Thus, the district court was not presented with a discretionary fact-finding task relating to quantity of drugs enumerated in Sec. 841(b). Moreover, Martinez-Zayas' reliance on Gibbs is misplaced.
 
 
 45
 In Gibbs, we noted that Sec. 841(b) "is merely a penalty provision to be used at sentencing, after conviction of the substantive crime." 813 F.2d at 600. Defendant contended that he had no notice of the possibility of being sentenced under an enhanced penalty provision. We held that the indictment provided sufficient notice by listing the amount of drugs involved. Id. at 600, 601. Moreover, without deciding whether the government must prove defendant's specific knowledge that the drug conspiracy involved a certain amount of drugs, we concluded that the trial record supported such a finding, and that the defendant did not contest the amount of drugs either at trial or sentencing. Id. at 602.
 
 
 46
 Gibbs' relevance for purposes of this appeal is its determination that the quantity of drugs involved in a Sec. 841(b) sentencing decision is not related to the issue of guilt. See id. at 599-601; accord United States v. Morgan, 835 F.2d 79, 81 (5th Cir.1987) (Gibbs holds that "quantity is not an element of the crimes proscribed by Secs. 841(a)(1) and 846 and need only be proved when the Government seeks an enhanced penalty."); United States v. Scanzello, 832 F.2d 18, 22 (3d Cir.1987) (Gibbs involved a statute that established an enhanced penalty, not an enhanced offense, and did not have to be charged to the jury). Gibbs does not address the issue whether a district court can avoid an express congressional desire to eliminate judicial discretion in sentencing under Sec. 841(b)--especially where the quantity of drugs is undisputed.
 
 
 47
 Martinez-Zayas' final argument, which is closely related to her "sentencing factor" contention, is that she is actually an aider and abettor, and was sentenced accordingly. Simply because she was charged and convicted of violating Sec. 841(a) as a principal, as opposed to violating Sec. 841(a) by way of 18 U.S.C. Sec. 2(a) (aiding and abetting liability), Martinez-Zayas maintains, does not mean that under established principles of law and under Gibbs, the court is duty-bound to sentence her as a principal. This view suffers from several flaws.
 
 
 48
 Most importantly, Martinez-Zayas was indicted under 21 U.S.C. Sec. 841(a), not 21 U.S.C. Sec. 841(a) and 18 U.S.C. Sec. 2. J.A. at 13 (indictment). The district court did not instruct the jury on an aiding and abetting theory, and Martinez-Zayas acknowledges that aiding and abetting was never mentioned during the proceedings. Indeed, she did not request such an instruction. Thus, this case is unlike United States v. Ambrose, 740 F.2d 505, 509 (7th Cir.1984), cert. denied, 472 U.S. 1017, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985), where defendants were convicted of violating 21 U.S.C. Sec. 848 (continuing criminal enterprise liability) under an aiding and abetting theory, and therefore were not subject to the mandatory sentencing provision for drug "kingpins" who commit felony narcotics violations as part of a continuing criminal enterprise.
 
 
 49
 Even assuming the trial record could be read to support a view of Martinez-Zayas as an aider and abettor, Congress did not provide an exception from the mandatory sentence to account for such cases. Instead, it concluded that drug quantity was the controlling indicator on whether mandatory penalties should apply. See discussion, supra. By charging Martinez-Zayas as a principal and introducing evidence to obtain a jury conviction on that count, the government guaranteed imposition of the mandatory ten-year penalty in this case.
 
 
 50
 Indeed, Martinez-Zayas does not contend on appeal that the evidence was insufficient to support her conviction as a principal. Our examination of the trial record demonstrates that the government produced evidence sufficient to support the jury's verdict. Although Martinez-Zayas maintained that she had no knowledge of, or involvement in, any activity involving the cocaine found in her house, the government introduced evidence that: (1) twelve kilograms of cocaine were hidden in the floor of her children's bedroom, and her children were permitted to play in the room during the day, but never slept there at night; (2) large amounts of drug paraphernalia, including hundreds, if not thousands, of plastic bags, were kept in her basement where she regularly performed laundry and ironing chores; and (3) she continued her association with Angel Hernandez despite his known drug distribution activities, and allowed him to retain unlimited access to her house. Viewed in the light most favorable to the government, therefore, there was substantial evidence to support the jury's finding of guilt beyond a reasonable doubt on both counts charging her with liability as a principal. See Government of Virgin Islands v. Williams, 739 F.2d 936, 940 (3d Cir.1984).
 
 
 51
 Accordingly, we will grant the government's motion for a writ of mandamus compelling the district court to resentence Martinez-Zayas pursuant to Sec. 841(b)(1)(A).
 
 V.
 
 52
 Despite our grant of the writ, we recognize the dilemma faced by the district judge, who concluded that Martinez-Zayas was not a major drug trafficker or the head of a drug distribution network. The court observed that Martinez-Zayas' conviction resulted from her link to an alleged drug ring operated by her boyfriend, Angel Hernandez, but that her role in that operation was comparable only to that of a middle-level drug dealer. Generally, consideration of such factors in setting a sentence is uniquely within the province of a district judge. See, e.g. Tucker, 404 U.S. at 446, 92 S.Ct. at 591 ("It is surely true ... that a trial judge in the federal judicial system generally has wide discretion in determining what sentence to impose."); United States v. Matthews, 773 F.2d 48, 52 (1985). Here, however, Congress expressly barred district judges from exercising that discretion.
 
 
 53
 Assuming the district court's conclusions are correct, this case illustrates the drawbacks of certain mandatory sentencing schemes. Congress adopted drug quantity as the sole indicator of major drug trafficking and imposed mandatory ten-year prison terms for violations of Sec. 841(a). As a result, defendants who are less prominent in the drug hierarchy are swept within the statute's reach regardless of the circumstances of their case so long as their conviction features more than five kilograms of cocaine.
 
 
 54
 With few exceptions, however, most sentencing decisions do not easily lend themselves to inflexible rules of law. See III American Bar Association Standards For Criminal Justice, Sentencing Alternatives and Procedures Sec. 18-2.1 & commentary, at 18.27 (1980) ("Absent discretion to respond to the substantial variety of offense and offender combinations that inevitably arise, our sentencing system can be neither just nor effective.") [hereinafter ABA Sentencing Alternatives ]; National Probation and Parole Association, Guides for Sentencing vii, 48 (1957).[5] By removing the district court's discretion to impose a penalty less than ten years in jail, Congress has in large part transferred the sentencing function from the court to the prosecutor. See ABA Sentencing Alternatives, at 18.27, 18.31 & n. 9.[6]
 
 
 55
 Rather than following the discretionary sentencing approach set forth in Sec. 3553 ("The court, in determining the particular sentence to be imposed, shall consider--(1) the nature and circumstances of the offense and the history and characteristics of the defendant...."), Congress adopted mandatory sentencing to address a grave problem. By virtue of Sec. 841(b)'s broad reach, Martinez-Zayas is subject to the same penalty as the nation's major drug distributors, despite the district court's finding of middle-level culpability. Although we question the soundness of this approach in cases like this one, we are not "licensed to attempt to soften the clear import of Congress' chosen words whenever [we believe] those words lead to a harsh result." Locke, 471 U.S. at 95, 105 S.Ct. at 1793.
 
 VI.
 
 56
 Finally, Martinez-Zayas maintains the district court erred by failing to suppress the four packets of cocaine seized from her purse, and the twelve kilograms seized from the floor in her children's bedroom.
 
 
 57
 Her claim concerning the purse lacks merit. Just before executing the search warrant for the premises, federal agents observed Martinez-Zayas entering 517 Butler Street carrying a purse. The warrant authorized a search of the house for cocaine, and also permitted agents to search for "proof of residency or occupancy and all fruits of crime including narcotics proceeds and paraphernalia." After entering the house, agents promptly questioned Martinez-Zayas concerning her identity and whether she resided in the house. At that point, a DEA agent searched the purse, which was about four feet away. Martinez-Zayas' purse was in the house subject to the search and was examined to confirm her identity and to determine whether it contained any items identified in the warrant. Under these circumstances, the search was authorized by the warrant, and we hold that district court properly denied the motion to the suppress the cocaine seized from the purse.[7]
 
 
 58
 Martinez-Zayas' claim concerning the validity of the warrant issued by a Philadelphia Municipal Court bail commissioner presents a more difficult question. She contends that because Fed.R.Crim.P. 41(a) authorizes only those warrants issued by "a federal magistrate or a judge of a state court of record ...", the bail commissioner, as a nonlawyer and a nonjudge, cannot lawfully issue federal search warrants.
 
 
 59
 Although the district court addressed the function and role of a Philadelphia bail commissioner in issuing warrants, its discussion was limited to Martinez-Zayas' claim that a finding of probable cause on a warrant issued by a bail commissioner must be subjected to heightened scrutiny. Martinez-Zayas did not raise the Rule 41(a) issue before the trial court, and she acknowledges this fact on appeal. As a result, pursuant to Fed.R.Crim.P. 52(b), we review this claim only for plain error. Under that standard, we are "concerned only with errors that seriously affect substantial rights or compromise the fairness of the proceedings." United States v. Bey, 736 F.2d 891, 895 (3d Cir.1984).
 
 
 60
 The government concedes that the warrant issued was a federal warrant, and therefore, the requirements of Rule 41 are implicated. It maintains, however, that because bail commissioners are attached to a state court of record, receive formal training in their duties, and are statutorily authorized to issue warrants, they should be considered judges under Rule 41. See generally 42 Pa.Cons.Stat.Ann. Sec. 1123(a)(5) (Purdon Supp.1988). Moreover, it argues, bail commissioners can fairly be considered to be state court judges under Pennsylvania law and under the plain meaning of the word "judge."
 
 
 61
 Rule 41(a) itself provides only limited guidance on this question. When it was adopted in 1948, the Rule codified an existing federal statute, 18 U.S.C. Sec. 611 (1940 ed.). See Fed.R.Crim.P. 41(a) advisory committee note to subdivision (a); W. Whitman, Federal Criminal Practice Under the Federal Rules of Criminal Procedure Sec. 41.2, at 319 & n. 4 (1950). Section 611 authorized the issuance of search warrants by "a judge of the United States district court, or by a judge of a state or Territorial court of record, or by a United States commissioner...." 18 U.S.C. Sec. 611 (1940 ed.). The statute had been interpreted to bar warrants issued on a blank form by a clerk of the municipal court, see Salata v. United States, 286 F. 125 (6th Cir.1923), yet by its express terms it permitted United States commissioners to issue warrants. Federal commissioners, of course, were not required to be lawyers until passage of the Federal Magistrates Act of 1968, 28 U.S.C. Secs. 631-39 (1982). Thus, at the time Rule 41(a) was enacted it permitted non-lawyers (federal commissioners) to issue search warrants.[8]
 
 
 62
 This fact, however, is not controlling on the issue whether Congress also intended to permit non-lawyer state officials to qualify as judges of a state court of record. Under Rule 41(a), whether an individual is a judge of a state court of record is governed by state law. See United States v. Hanson, 469 F.2d 1375, 1377 (5th Cir.1972); Navarro v. United States, 400 F.2d 315, 316 (5th Cir.1968); United States v. Messerly, 530 F.Supp. 751, 753 (D. Montana 1982). State judges were included in Rule 41 "because they are far more plentiful than the small corps of federal magistrates." United States v. Burke, 517 F.2d 377, 382 (2d Cir.1975).
 
 
 63
 Pennsylvania's statutory scheme does not definitively resolve this question, but it does provide guidance. Pennsylvania law, see 42 Pa.Cons.Stat.Ann. Sec. 1123(a)(5), authorizes Philadelphia Municipal Court judges to appoint six bail commissioners for six-year terms. Those commissioners are authorized to: "administer oaths and affirmations, preside at preliminary arraignments, assign counsel in certain cases, issue criminal complaints, fix bail and issue arrest warrants and search and seizure warrants." Id.
 
 
 64
 The subchapter of Title 42 governing bail commissioners is entitled "Qualifications of Certain Minor Judiciary," and it defines "judge" as a judge of the Pittsburgh Magistrates Court or the Traffic Court of Philadelphia. Id. Sec. 3111 (Purdon Supp.1988). The definition of bail commissioner was added in 1984 to describe a bail commissioner in Philadelphia Municipal Court. Id.
 
 
 65
 More importantly, state law recognizes that "district justices, bail commissioners, and judges" need not be members of the bar. These officers are considered "minor judiciary." Id. Sec. 102, and before assuming office they must complete a training course, and pass an examination, id. Sec. 3112, and thereafter they must attend an annual twenty-hour refresher course. Id. Sec. 3118. State law permits bail commissioners to attend a shorter initial training course (minimum of thirty hours) than district justices (minimum of forty hours), and permits traffic court judges to attend a shorter course (minimum of twenty hours) than bail commissioners. Id. Sec. 3113.
 
 
 66
 Finally, Pennsylvania defines "district justices" as "a justice of the peace," but defines "judicial officers" as "judges, district justices and appointive judicial officers." An "appointive judicial officer" is an arbitrator, auditor, commissioner to take oaths and depositions, custodian, guardian, examiner, master, receiver, trustee or referee. "Judge" is defined as including "a justice of the Supreme Court" and a "senior judge." Id. Sec. 102. "Court," meanwhile, is defined as "any one or more of the judges of the court who are authorized by general rule or rule of court, or by law or usage, to exercise the powers of the court in the name of the court." Id.
 
 
 67
 Thus, although Philadelphia bail commissioners are authorized to issue search warrants, state law is unclear whether bail commissioners are considered equivalent to Philadelphia Municipal Court judges or to one of a number of appointed nonlegal judicial officers authorized to carry out various tasks to aid the state court system.
 
 
 68
 Similarly, decisions of courts applying the law of other states offer little guidance because they focus on whether a particular court is a "court of record," rather than whether an individual is a "judge." E.g. United States v. Sturgeon, 501 F.2d 1270, 1274 (8th Cir.) (under Iowa law, Cedar Rapids Municipal Court is a state court of record), cert. denied, 419 U.S. 1071, 95 S.Ct. 659, 42 L.Ed.2d 667 (1974); Hanson, 469 F.2d at 1377 (under Texas law, justice of peace is not a state court of record even though the office has the procedural indicia of a court of record); Navarro, 400 F.2d at 316 (under Texas law, San Antonio Corporation Court is not a court of record); Messerly, 530 F.Supp. at 753 (under Montana law, tribal court is not a court of record); see United States v. Elkins, 732 F.2d 1280, 1286 (6th Cir.1984) (Tennessee Court of General Sessions is not a state court of record). The only two cases applying Pennsylvania law did so in a summary fashion without reference to state law. See United State v. McAvoy, 510 F.Supp. 60, 63 (W.D.Pa.1981) (Pennsylvania magistrate's court is not a state court of record under Rule 41); United States v. Brougher, 19 F.R.D. 79, 83 (W.D.Pa.1956) (justice of peace cannot issue warrant pursuant to Rule 41). In Brougher, the court emphasized that federal search warrants were governed by a strict standard, and that federal agents had deliberately bypassed a federal commissioner and a state court judge, and had instead obtained a warrant issued by a justice of the peace to a state police officer. 19 F.R.D. at 83.[9]
 
 
 69
 Although our survey of the relevant authorities raises some question under Rule 41 concerning the practice of obtaining search warrants from Philadelphia bail commissioners, especially when federal magistrates are available, compare United States v. Burgard, 551 F.2d 190, 193 (8th Cir.1977) (state judge issued warrant after agents were unable to locate a federal magistrate), we need not decide this question at this time. Even assuming the warrant in this case violated Rule 41(a), this case is governed by the doctrine first set forth in Burke, 517 F.2d at 386-87, and recently reaffirmed in United States v. Comstock, 805 F.2d 1194, 1205-10 (5th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1908, 95 L.Ed.2d 513 (1987). Under that approach, when the Rule 41 violation is not of a constitutional magnitude,
 
 
 70
 violations of Rule 41 alone should not lead to exclusion unless (1) there was "prejudice" in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.
 
 
 71
 Burke, 517 F.2d at 386-87 (footnotes omitted); Comstock, 805 F.2d at 1207 ("Good faith in this context implies not only that Rule 41 was not knowingly and intentionally violated, but also that the officers did not act with reckless disregard or conscious indifference to whether it applied and was complied with."); see also United States v. Crawford, 657 F.2d 1041, 1047 (9th Cir.1981); United States v. Vasser, 648 F.2d 507, 510-11 (9th Cir.1980); United States v. Pennington, 635 F.2d 1387, 1390 (10th Cir.1980); Burgard, 551 F.2d at 193; cf. United States v. Hall, 505 F.2d 961, 964 (3d Cir.1974) (suppression appropriate for violation of Rule 41(d) only if defendant demonstrates prejudice).
 
 
 72
 Here, of course, Martinez-Zayas' Rule 41 claim is not of constitutional magnitude, i.e., a violation of the Fourth Amendment; rather, it focuses on an alleged violation of the Rule's technical requirements. As a result, we shall exclude the evidence seized pursuant to the warrant only if a Rule 41 violation requires suppression under the Burke test.
 
 
 73
 Aside from the fact that this warrant could have been obtained from a federal magistrate, the record is silent on the agents' reckless disregard, conscious indifference, or intentional and deliberate disregard of the requirements of Rule 41. Given the uncertain state of the law with respect to the validity of obtaining warrants from various state officers under Rule 41(a), see discussion supra, and the Pennsylvania statute expressly authorizing bail commissioners to issue arrest and search warrants, 42 Pa.Cons.Stat.Ann. Sec. 1123, we cannot impute bad faith or reckless disregard.
 
 
 74
 The agents obtained the warrant almost immediately upon receiving an informant's tip that a large quantity of cocaine could be found at the house and would be promptly distributed.[10] Exigency, of course, cannot justify an intentional or reckless violation of Rule 41(a). Yet, the need for swift police action in this case, combined with the uncertain state of the law concerning the status of city bail commissioners as state judges, fails to support an inference of bad faith or intentional disregard of Rule 41's requirements. Moreover, the warrant was obtained as part of a dual investigation by the DEA and the Philadelphia Police, and we are hesitant to discourage such cooperative undertakings where there is no showing of bad faith. See 3 C. Wright, Federal Practice & Procedure Sec. 670, at 729 & n. 49 (1982).
 
 
 75
 Similarly, Rule 41 does not, by its terms, require that federal agents first seek a warrant from a federal magistrate. Rather, it authorizes warrants issued by a federal magistrate or by a judge of a state court of record. Thus, if under Pennsylvania law, a bail commissioner is considered a judge of a state court of record, Rule 41(a) would not bar federal agents involved in a joint investigation from obtaining the warrant from a state judge. We question why federal agents would bypass available federal magistrates, but we are not presented with any evidence that the agents believed a federal magistrate would not find probable cause to support issuance of the warrant, or that the bail commissioner would issue warrants that a federal magistrate would deny. Indeed, because the Rule 41 claim was not raised below, nothing in the record suggests why agents obtained the warrant from the city bail commissioner.
 
 
 76
 Finally, there is nothing to indicate that but for issuance of the warrant by the bail commissioner the search might not have occurred. The district court upheld the validity of the warrant, and Martinez-Zayas does not contend on this appeal that the warrant was defective, i.e., either facially defective or lacking in probable cause. Indeed, we have held that the warrant authorized a search of Martinez-Zayas' purse. See supra Part VI.
 
 
 77
 Given our standard of review, we cannot conclude that even assuming noncompliance with Rule 41(a), the violation in this case rises to the level of plain error.
 
 VII.
 
 78
 Accordingly, we will direct the district court to vacate its five-year sentence and to resentence Martinez-Zayas consistent with Sec. 841(b)(1)(A). In addition, we will affirm the district court's denial of Martinez-Zayas' motion to suppress cocaine seized from her purse and from her house.
 
 
 
 [1]
 In the illegal narcotics industry, federal agents testified, colored tape is used to indicate that the drugs are a product of a specific organization. In some instances, drug organizations steal customers by using the same color tape as their competitors. Here, agents found two rolls of yellow tape, which they said is usually used by the Hernandez organization, and six rolls of different colored tape. See generally J.A. at 404-06, 445
 
 
 [2]
 Sec. 2 Prospective Application of Sentencing Reform Act
 (a) Application--Section 235(a)(1) of the Comprehensive Crime Control Act of 1984 is amended by inserting after "date of enactment" the first place it appears the following: "and shall apply only to offenses committed after the taking effect of this chapter."
 
 
 [101]
 Stat. at 1266
 
 
 [3]
 She does not, however, raise a constitutional challenge to Congress' decision to impose mandatory sentences for violations of Sec. 841. Compare United States v. Holmes, 838 F.2d 1175 (11th Cir.) (due process challenge to Sec. 841(b)(1)), cert. denied, 108 S.Ct. 2829 (1988). Martinez-Zayas' constitutional challenge was rejected by the district court and that decision is not contested here
 
 
 [4]
 In addition to receiving food stamps and welfare payments, Martinez-Zayas testified that she earned about $286 a week during periods of intermittent employment at a local box company. See generally J.A. at 2-20. She said she was forced to work at the box company under an assumed identity (Carmen Lopez) because the "Welfare Department wouldn't give me the money that I needed." Id. at 3
 
 
 [5]
 Although Congress should provide guides and establish limits to a court's exercise of sentencing discretion, statutory withdrawal of all judicial discretion may lead to unfair results. See ABA Sentencing Alternatives, at 18.6; cf. Model Penal Code Sec. 7.01 (1962) (outlining factors relevant in sentencing)
 Congress recognized this by enacting 18 U.S.C. Sec. 3553 and 28 U.S.C. Sec. 994, establishing sentencing guidelines and appellate review of sentences. See generally United States Sentencing Commission Guidelines Manual 1.1, 1.3 (1987) (policy statement) (Commission balanced the need for judicial discretion in sentencing with the "virtues and vices of broad, simple categorization and detailed, complex subcategorization").
 For a different, less formalistic approach in which the guidelines serve only as a benchmark and where the sentencing judge retains significant discretion, see, e.g., 42 Pa.Cons.Stat.Ann Sec. 9721 (Purdon 1982).
 
 
 [6]
 Mandatory sentencing, therefore, is based on the belief that every violation of a statute merits identical punishment
 Although "like cases" might be treated more alike under such a legislative model of nondiscretionary sentencing, so also would "unlike cases." Highly dissimilar offenders (in terms of their relative culpability) would receive the same sentence. In the end, the effect would be to substitute one type of sentencing disparity--the similar treatment of dissimilar cases--for inequity that results when similar cases are treated dissimilarly.
 ABA Sentencing Alternatives, at 18.31.
 
 
 [7]
 In addition, we believe the Supreme Court's decision in United States v. Ross, 456 U.S. 798, 820-21 & n. 27, 102 S.Ct. 2157, 2170, & n. 27, 72 L.Ed.2d 572 (1982), offers additional support our decision. In Ross, the Court observed:
 A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found.... When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home ... must give way to the interest in the prompt and efficient completion of the task at hand.
 Id. (footnotes omitted).
 Martinez-Zayas nevertheless claims that the agents' search exceeded the bounds of the warrant because she was seen carrying the purse when she entered the house. Therefore, she maintains, the search of her purse was actually an unlawful search of her person. We disagree.
 This is not a case in which she was carrying the purse and government agents searched the purse as part of a search of her person before they had probable cause to arrest her. Rather, the purse was on a table in the house nearly four feet away from Martinez-Zayas, and she resided in the house. Cf. United States v. GIWA, 831 F.2d 538, 543-45 (5th Cir.1987) (in examining what constitutes a personal search of a visitor, court should determine whether there was physical possession, and then examine the relationship between the person and the place). Here, we are not presented with an issue involving a search of Martinez-Zayas' person.
 
 
 [8]
 The Supreme Court has recognized that search warrants "have long been issued by persons who are neither lawyers nor judges," see Illinois v. Gates, 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983), and noted that probable cause involves a "nontechnical, common-sense judgment of laymen." Id. Yet, at least one commentator cautions against permitting what may have been tolerated in earlier times "because of the unavailability of law-trained judicial personnel" to permanently establish the boundaries of the Fourth Amendment. See 2 W. LaFave, Search and Seizure Sec. 4.2(c), at 159 (1987). The shortcomings of permitting nonlawyers to issue warrants include: (1) the increasing legal complexity of search and seizure law; (2) the danger of nonlawyers relying on law enforcement personnel for guidance; and (3) the Supreme Court recent reliance on magistrate's "good faith" in issuing warrants, see United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). W. LaFave, supra, at 159-60
 
 
 [9]
 Contrary to the suggestion in United States v. Comstock, 805 F.2d 1194, 1201 n. 7 (5th Cir.1986), our decision in United States ex rel. Boyance v. Myers, 398 F.2d 896, 897 (3d Cir.1968), is irrelevant to this issue. In Boyance, which involved a habeas corpus petition from a state prisoner, we examined the constitutionality of a nighttime search. Although the warrant was issued by a county justice of the peace, the search was conducted by local police officers. No federal agents were involved, and the Rule 41(a) issue was not raised or implicated
 
 
 [10]
 Agent Fekete testified that his informant reported that twenty kilograms of cocaine had been delivered to 517 Butler Street on November 2, 1986. He said the informant reported that two or three kilos had been distributed that evening, and therefore agents believed "there was a potential that more of it had already been sold" by the time the search warrant was obtained at 3:30 p.m. on November 3. J.A. at 402-03