

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-2-1994

# United States of America v. Carr

Precedential or Non-Precedential:

Docket 93-1376

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"United States of America v. Carr" (1994). *1994 Decisions.* Paper 35.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/35

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 93-1376 & 93-1383
_____

UNITED STATES OF AMERICA

v.

ROBERT JOSEPH CARR, JR.,

Appellant in No. 93-1376

_____


UNITED STATES OF AMERICA

v.

WALTER ORLANDO CARDONA-USQUIANO,

Appellant in No. 93-1383

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. Nos. 92-00102-08, 92-00102-09)
_____

Argued February 14, 1994

Before:  BECKER, HUTCHINSON and COWEN, Circuit Judges

(Filed June 3 , 1994)

_____


Peter Goldberger (argued)
9th and Chestnut Streets
Suite 400, The Ben Franklin
Philadelphia, PA 19107

COUNSEL FOR APPELLANT
ROBERT JOSEPH CARR, JR.


James P. Lyons (argued)
Powell & Minehart
7600 Castor Avenue
Philadelphia, PA 19152

        COUNSEL FOR APPELLANT
        WALTER ORLANDO CARDONA-USQUIANO

Michael J. Rotko
  United States Attorney
Walter S. Batty, Jr.
  Assistant United States Attorney
Ewald Zittlau (argued)
  Assistant United States Attorney
615 Chestnut Street
Philadelphia, PA 19106

        COUNSEL FOR APPELLEE
        UNITED STATES OF AMERICA

---

**OPINION OF THE COURT**
---

COWEN, Circuit Judge.


        Along with numerous other co-defendants, Robert Joseph Carr, Jr. ("Carr") and Walter Orlando Cardona-Usquiano ("Cardona") were charged in a multi-count indictment with participating in a money laundering conspiracy.  Carr was charged with and convicted of three counts: conspiracy to launder money in violation of 18 U.S.C. § 371 ("Count 1"); money laundering on July 11, 1990, in violation of 18 U.S.C. § 1956(a)(2), by attempting to transport $186,000 in cash outside of the United

2

States ("Count 21"); and failure to file a Customs Service currency report, in violation of 31 U.S.C. §§ 5316 and 5322, for attempting to export more than $10,000 in currency on July 11, 1990 ("Count 22"). Cardona was charged with and convicted only of Count 1, the conspiracy count.

Both Carr and Cardona appeal their convictions on Count 1 by arguing the evidence was insufficient to prove beyond a reasonable doubt that they shared the knowledge and intent necessary to establish guilt of conspiracy. Carr also challenges the sufficiency of evidence to support his conviction on Count 21, the attempted money laundering count. Furthermore, both appellants take issue with the district court's denial of a downward adjustment in their respective sentences for being a minimal or minor participant in the offense of conviction.[0] We find no error in the orders of the district court and will affirm the convictions and sentences imposed.

### I.

We will limit our presentation of the factual background to evidence involving Carr and Cardona, as well as their interaction with Javier Gonzalez, the kingpin of the conspiracy, and several other co-defendants. The conspiracy was revealed to the government by a cooperating witness who engaged

---

[0]Cardona also appeals his sentence by arguing that the district court improperly enhanced his base offense level by three levels for knowing the money involved in the conspiracy was derived from illegal drug trafficking. Carr also appeals the fine of $10,000 that was imposed as part of his sentence.

in numerous money laundering transactions with the conspirators beginning in February, 1989 and ending in January, 1991. Javier Gonzalez, the kingpin, and his wife Doris Gonzalez owned and operated two businesses in Philadelphia, Pennsylvania during the course of this conspiracy--a travel agency ("Jav G. Travel") and a beer distributorship. Their daughter Margareth Gonzalez, another co-defendant, worked at Jav G. Travel during this time period.

Carr had formerly been employed for approximately twelve years as a ticketing manager with an airline company that provided commercial flights to Colombia. He met Javier Gonzalez, who frequently travelled to South America for business purposes, while working at his former job. At trial Carr testified that he was friendly with Javier Gonzalez, he regularly flew with him as a travelling companion, and he had been employed as a tour coordinator for Jav G. Travel. Cardona, a Colombian national, was a tenant in a duplex house owned by Javier Gonzalez.

The United States Customs Service commenced an undercover investigation of Javier Gonzalez in early 1989. A cooperating witness represented himself to Javier Gonzalez as a money launderer of cocaine drug trafficking proceeds. Over the next two years, the cooperating witness provided Gonzalez with large quantities of cash to wire outside the country to the Cayman Islands and Colombia, as well as large quantities of fresh $100 bills which were exchanged for quantities of bills of smaller denomination plus a commission. All of the individual transactions involved sums well in excess of $10,000, and the

4

total amount exchanged or wired out of the country over the two year period was in excess of $1,250,000. No Currency Transaction Reports ("CTR"), which are required to be filed with the government for any cash transaction of greater than $10,000, were prepared by Javier Gonzalez or Jav G. Travel for any of the transactions. Law enforcement canines trained to respond to drugs reacted positively to the bills provided by Gonzalez after all monetary exchanges for small denomination bills, except in one instance when a dog was not available.

## A. Evidence Relating to Carr

Evidence introduced at trial established that on March 29, 1989 the cooperating witness brought $45,000 in $100 bills to Javier Gonzalez, represented the cash as illegal drug proceeds, and requested that it be deposited into a Cayman Islands bank account. The money could not be deposited in cash so it was divided into five checks, ranging from $8,500 to $9,500, the last two of which were deposited on May 19, 1989. Carr's passport showed that he traveled to the Cayman Islands on May 18, 1989 and departed on May 20, 1989. Carr's airline ticket was issued by Jav G. Travel and paid for by Javier Gonzalez.

On August 24, 1989 the cooperating witness exchanged $150,000 in $100 bills with Javier Gonzalez for bills of smaller denomination. Carr's passport reveals that he traveled from Philadelphia to Cali, Colombia on August 28, 1989 and returned on August 29, 1989. Javier Gonzalez paid for the trip and accompanied Carr.

The cooperating witness exchanged $100,000 in $100 bills on February 20, 1990 with Javier Gonzalez for bills of smaller denomination. Carr's passport stamps showed that he arrived in Cartagena, Colombia four days later on February 24, 1990 for a one-day stay. Again, Javier Gonzalez financed the trip and traveled with Carr to Colombia.

A similar exchange of $200,000 in $100 bills for bills of smaller denomination took place on April 24, 1990. Carr traveled from Philadelphia to Cali, Colombia the next day, April 25, 1990, with Javier Gonzalez. Carr's passport showed an exit stamp dated April 27, 1990 indicating his departure from Colombia. With respect to all these trips, Carr testified that he did not carry any money for Gonzalez out of the country and that he went along with Gonzalez only as a travelling companion.

The next exchange of $100 bills for bills of smaller denomination, totalling $90,000, took place between the cooperating witness and Doris Gonzalez on May 1, 1990. The next day, surveillance agents observed Carr visit Jav G. Travel. On May 3, 1990 Carr reported his passport lost or stolen at the passport agency in Philadelphia. The passport allegedly lost or stolen contained numerous stamps indicating trips of very short duration to Colombia, which might raise the suspicions of customs inspectors. At the same time, Carr applied for an emergency same-day replacement passport alleging that he was scheduled to travel to the United Kingdom the next day for a seven day trip. To support this allegation, Carr showed the passport agency an airline ticket issued through Jav G. Travel in his name. In

6

fact, Carr traveled not to England but to Colombia on May 4, 1990, staying for only one day. Carr's "lost" passport was found in his residence on the date of his arrest.

In June and July, 1990, wiretaps were placed on telephone lines at Jav G. Travel and the beer distributorship. On July 9, 1990, the cooperating witness exchanged $190,000 in $100 bills with Doris Gonzalez at the travel agency for bills of smaller denomination. The following day, July 10, 1990, Margareth Gonzalez called Carr and told him that "tomorrow is the big day." Appendix ("App.") (Carr) at 178. On July 11, 1990, Javier Gonzalez, Carr, and a female companion departed Philadelphia International Airport en route to Cali, Colombia via Atlanta and Miami. In the airline departure area, Gonzalez was seen transferring a blue carry-on bag and a wad of bills to Carr.

Mr. Carr and his companion sat in coach, separated from Gonzalez who was in first class. At a layover in Miami, all passengers including Carr were stopped by U.S. Customs. Customs advised Carr that a Currency Monetary Instruments Report ("CMIR") must be filed to show the transportation of cash in excess of $10,000 out of the United States. In response to a declaration request, Carr told Customs that he was carrying only $4,000 in cash and that he did not possess cash in excess of $10,000.[0] During a lawful search, Customs found $180,000 in $100 bills with serial numbers matching those on bills provided by the

---

[0]Prior to October 12, 1984, cash transportations outside of the United States in excess of $5,000 were required to be reported on CMIR's.

7

cooperating witness on May 1, 1990 in two coffee mugs and a talcum container in Carr's blue carry-on bag. An additional sum of $6,000 in $100 bills was found on Carr. Javier Gonzalez was not detained.

Carr was not placed under arrest. When questioned about the money, Carr told U.S. Customs officials that he had picked up the bag from a train station locker in Philadelphia after an anonymous phone call. Carr stated that the bag was not his, that he did not know who owned the bag, and that he was expecting a call at a hotel in Cali, Colombia to instruct him where to deliver it. After several hours of questioning, Carr was released in Miami. Javier Gonzalez had continued on to Colombia.

After he was released, Carr called Jav G. Travel and spoke to Margareth and Doris Gonzalez. Carr told Doris Gonzalez that "I just got out of Customs," and that "if he calls you . . . it's all gone." App. (Carr) at 187-88. Doris Gonzalez became upset on the phone. Later that evening, Javier Gonzalez spoke to his wife Doris who told him that Carr had called from Miami and told her that "they took everything." Id. at 194. After a grand jury returned a sealed indictment naming him on the three money laundering counts, Carr was arrested at his mother's home in Philadelphia where he was living.


B. Evidence Relating to Cardona

Evidence introduced at trial showed that Cardona was born in Medellin, Colombia, arrived in the United States on May

8

31, 1989, and was a legal permanent resident.  During the course of the money laundering conspiracy, Cardona was living in a duplex house in Philadelphia owned by Javier Gonzalez.

Completion of the April 20, 1990 exchange of bills between the cooperating witness and Javier Gonzalez was delayed for several hours because Gonzalez was short $14,500.  After Gonzalez asked the cooperating witness to return in several hours, a call was placed from Jav G. Travel to a phone number registered to Cardona.  Shortly thereafter, Cardona and a co-defendant, who was carrying a dark green shopping bag, arrived at Jav G. Travel, stayed a few minutes, and then departed.  Company records showed no legitimate business transaction took place between Jav G. Travel and either of the visitors on that date.  When the cooperating witness returned, he was provided with the $14,500 and his commission in $5, $10, and $20 bill denominations.  Gonzalez told the cooperating witness that he had been short because he did not want to accept and exchange $1 bills.  On this date, no drug-sniffing canine was available to ascertain whether any drugs had contaminated the particular bills.

Cardona was also observed entering Jav G. Travel on four other occasions around the time cash transfers were taking place between the cooperating witness and Javier Gonzalez.  On March 8, 1990, Cardona entered Jav G. Travel carrying a box with a co-defendant.  Cardona was also seen entering Jav G. Travel with a co-defendant on April 17, April 23, and April 26, 1990. On two of these occasions the co-defendant was carrying a bag, while

on the third occasion Cardona was carrying a black bag. No evidence was presented concerning the contents of the box or the bags. Records seized from the travel agency reveal that no legitimate business transaction was consummated between the parties on any of these dates.

On May 28, 1992, a search warrant was executed at Cardona's residence in Philadelphia. Cardona and a co-defendant were arrested. Police found $22,900 in cash in small denominations hidden in various places in Cardona's master bedroom. Cash totalling approximately $10,500 in $1, $5, $10, and $20 denominations was found in several hiding places in the common basement of the duplex house. Also found in the basement were eleven boxes of glassine bags commonly used to package drugs for street sale. No evidence of drugs being found in the house was presented at the trial, but a narcotics dog did alert to the presence of drugs on the currency found in Cardona's bedroom and the basement.

When questioned by police, Cardona denied knowing Gonzalez even though Gonzalez owned the house in which Cardona was living. This statement was controverted by tape-recorded evidence indicating Gonzalez had introduced the cooperating witness to Cardona on July 5, 1990. Records seized from Jav G. Travel on May 28, 1992 contained money order receipts showing the transfer by Cardona and his wife from the United States to various individuals also named Cardona in Colombia of sums in the amount of $20,600 for 1989, $45,140 for 1990, $14,040 for 1991, and $15,700 for 1992. Cardona's 1990 federal tax return, which

10

indicated that he was self-employed as a consultant, reported $18,364 in taxable income.

                              II.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a) and (e) to consider these appeals of the defendants' convictions and sentences imposed.  Both Carr and Cardona appeal their convictions on the conspiracy count, arguing that there was insufficient evidence presented at trial to prove beyond a reasonable doubt that they shared the knowledge and intent necessary to conspire to launder money.  We employ the following standard of review when considering a sufficiency of evidence challenge after a conviction:

> [A]n appellate court must sustain the verdict of a jury if there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision. In determining whether evidence is sufficient, we will not weigh evidence or determine the credibility of witnesses. Appellate reversal on the grounds of insufficient evidence should be confined to cases where the failure of the prosecution is clear.  The evidence need not be inconsistent with every conclusion save that of guilt, so long as it establishes a case from which a jury could find the defendant guilty beyond a reasonable doubt.  A defendant challenging the sufficiency of the evidence bears a heavy burden.

United States v. Casper, 956 F.2d 416, 421 (3d Cir. 1992) (citations omitted).

The government must establish a unity of purpose, an intent to achieve a common goal, and an agreement to work together in order to convict a criminal defendant of conspiracy. United States v. McGlory, 968 F.2d 309, 321 (3d Cir. 1992), cert. denied, __ U.S. __, 113 S. Ct. 415 (1992), and __ U.S. __, 113 S.

11

Ct. 627 (1992), and ___ U.S. ___, 113 S. Ct. 1388 (1993). However, a conviction for conspiracy does not require that every element of the crime be proven with direct evidence. See id. Rather, the government can rely entirely on circumstantial evidence to prove that an alleged conspirator had the knowledge and intent necessary to commit the crime. Id.; United States v. Iafelice, 978 F.2d 92, 96-98 (3d Cir. 1992). When the government relies purely on circumstantial evidence, however, "the inferences drawn must have a logical and convincing connection to the facts established." Casper, 956 F.2d at 422 (citing United States v. McNeill, 887 F.2d 448, 450 (3d Cir. 1989), cert. denied, 493 U.S. 1087, 110 S. Ct. 1152, 107 L.Ed.2d 1055 (1990)).

The conspiracy count of the indictment alleged that the co-defendants knowingly and intentionally engaged in three related criminal objectives: (1) impeding United States efforts to collect accurate reports and information relating to domestic currency transactions in excess of $10,000; (2) conducting financial transactions in violation of 18 U.S.C. § 1956(a)(1) designed to conceal and disguise the nature, source, location, ownership, and control of proceeds of specified unlawful activity, namely the felonious sale and distribution of illegal drugs; and (3) transporting and transferring money from Philadelphia outside the United States to the Cayman Islands and Colombia in violation of 18 U.S.C. § 1956(a)(2). The convictions can be upheld on appeal if there is sufficient circumstantial evidence to prove beyond a reasonable doubt that Carr and Cardona knowingly and intentionally committed acts furthering any of the

12

three objects of the conspiracy.  See Griffin v. United States, __ U.S. __, __, 112 S. Ct. 466, 469-74 (1991) (guilty verdict in a multiple-object conspiracy need not be set aside even though the evidence is not adequate to support the conviction as to one of the objects); United States v. Vastola, 989 F.2d 1318, 1330-31 (3d Cir. 1993).  Thus, viewed in hindsight the evidence need not prove that Carr and Cardona each committed acts furthering all three objectives of the conspiracy.

Without discussing all the evidence tending to prove Cardona's guilt, we conclude that a rational trier of fact could find beyond a reasonable doubt that Cardona engaged in at least the last two of the three criminal conspiracy objectives.  With respect to the second conspiracy objective, engaging in domestic money laundering transactions, evidence showed that Cardona made numerous trips to Jav G. Travel immediately prior to an exchange of money between the cooperating witness and Javier or Doris Gonzalez.  Evidence produced at trial conclusively established as fact that large money transfers took place, that no CTR's were filed, that over $33,000 in small denomination bills was found in Cardona's apartment on the date of his arrest, that drug packaging equipment was confiscated at his apartment, and that trained drug-sniffing canines reacted positively to the small denomination bills provided by the conspirators.[0]  Although the

_____

[0]Both Carr and Cardona argue that any evidence concerning positive drug-sniff identifications by the trained canines should not be considered probative of guilt, given that studies have shown that between seventy and ninety-seven percent of all cash in circulation in the United States is tainted with a sufficient quantity of cocaine to alert a trained dog.  See United States v.

13

Fifty-three Thousand Eighty-two Dollars ($53,082) in United States Currency, 985 F.2d 245, 250-51 n.5 (6th Cir. 1993) (dicta questioning the evidentiary value of a trained dog's alert to currency); United States v. Six Hundred Thirty-nine Thousand Five Hundred and Fifty-eight Dollars ($639,558) in United States Currency, 955 F.2d 712, 714 n.2 (D.C. Cir. 1992) (dicta discussing studies).  Citing only to these two cases as authority, they argue that the alerts mean nothing.  At oral argument Carr requested that this court take judicial notice of the fact that a large percentage of dollar bills in circulation is tainted with illegal narcotics, without directing the court to any particular study.

Under Federal Rule of Evidence 201(f), judicial notice of an adjudicative fact may be taken by an appellate court.  However, the "fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonable be questioned."  Fed. R. Ev. 201(b).  We decline to take judicial notice in this instance because we do not believe that such a fact is either commonly known or readily determinable through unquestionably reliable sources.  Compare Carley v. Wheeled Coach, 991 F.2d 1117, 1126 (3d Cir.) (quantity and nature of government tests concerning vehicle rollovers "are not matters of common knowledge, nor are they readily provable through a source whose accuracy cannot reasonably be questioned"), cert. denied, __ U.S. __, 114 S. Ct. 191 (1993), with United States v. Pozsgai, 999 F.2d 719, 731 (3d Cir. 1993) (relying on two scholarly history books and a U.S. Army Corps of Engineers report, court took judicial notice of the fact that the Pennsylvania Canal was or could be used in interstate commerce), cert. denied, __ U.S. __, 114 S. Ct. 1052 (1994).

Because we decline the defendants' invitation to take judicial notice of the fact that nearly all currency contains detectable traces of illegal narcotics, we consider the dog alert evidence as only another piece of evidence tending to show that Carr and Cardona knew that the money involved in the conspiracy was derived from illegal drug trafficking.  We note that the cases relied on by Carr and Cardona for authority that courts of appeals increasingly are calling dog alert evidence into doubt discuss this proposition only in dicta because in both cases the courts independently upheld a trial court's grant of a motion to suppress the cash as evidence.  United States v. $53,082, 985 F.2d at 250; United States v. $639,558, 955 F.2d at 714. Furthermore, this court has recognized that a district court has discretion to admit a trained dog's alert to currency as evidence of guilt.  See United States v. Headley, 923 F.2d 1079, 1082 n.1

14

visits made by Cardona to Jav G. Travel are only circumstantial evidence of guilt, the frequency and nature of the trips provide a "logical and convincing connection to the facts established" at trial, Casper, 956 F.2d at 422. The presence of such a large quantity of cash in Cardona's residence, which trained canines alerted to, along with the presence of drug packaging equipment, provides further circumstantial evidence directly linking Cardona to the money laundering conspiracy and indicating that he knew the money involved was derived from illegal drug trafficking. See United States v. Ramirez, 954 F.2d 1035, 1039-40 (5th Cir.) (jury could permissibly infer that money found at defendant's residence

---

(3d Cir. 1991). On this record, we cannot say that the district court abused its discretion in admitting the dog sniff evidence.

Furthermore, neither Carr nor Cardona have challenged the admission of the dog sniff evidence as plain error. Judge Becker, dissenting on this point, agrees that admission of the evidence does not rise to plain error, but states that the dog sniff evidence should be given absolutely no weight in our review of the sufficiency of evidence because it is inherently problematic. We believe Judge Becker misconstrues our appellate role in reviewing the sufficiency of the evidence. When undertaking a sufficiency of evidence review, it is a fundamental principle that "it is not the proper function of an appellate court to weigh evidence anew." United States v. Giuliano, 263 F.2d 582, 584 (3d Cir. 1959). The Supreme Court has made clear that appellate courts are not "to weigh the evidence or to determine the credibility of witnesses. The jury verdict must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80, 62 S. Ct. 457, 469 (1942). Once we determine that the evidence was properly presented to the jury, and in this case we have determined that the dog sniff evidence properly was presented to the jury, we cannot substitute our view of what weight that evidence should receive during the guilt/innocence determination for that of the jury's. Finally, to the extent Judge Becker has added his view on the unreliability of dog sniff evidence as a guide for judges deciding other cases, it is dictum.

15

represented proceeds of illegal activity from evidence tending to show that defendant was a member of a drug trafficking ring), cert. denied, __ U.S. __, 112 S. Ct. 3010 (1992).

In reviewing the sufficiency of evidence, we also conclude that a rational trier of fact could find beyond a reasonable doubt that Cardona conspired to illegally transfer money outside of the United States to his native Colombia, the third objective of the conspiracy. Money order receipts obtained from Jav G. Travel revealed transfers totalling $45,140 from Cardona to people presumed to be members of his family in Colombia in 1990 alone. No CTR's or CMIR's were filed for any of those transactions. That same year, Cardona reported only $18,364 in income to the government on his tax return. When viewed in light of the totality of the evidence, including the confiscation of drug packaging equipment from his residence, such a large amount of money sent by a person with limited income to Colombia via wire transfers was sufficient evidence for a reasonable jury to convict Cardona of participating in the money laundering conspiracy. See United States v. Massac, 867 F.2d 174, 178 (3d Cir. 1989) (evidence of defendant's use of a wire service to transfer $22,000 in cash to Haiti over a five month period, combined with evidence of drug trafficking, was sufficient to convict on money laundering count); United States v. Blackman, 904 F.2d 1250, 1257 (8th Cir. 1990) (government's introduction into evidence that money laundering defendant had no legitimate source of income was proper, but not dispositive, to

16

raise inference that funds came from illegal drug distribution activities).

Based on all of the circumstantial evidence, we believe that a rational juror could conclude beyond a reasonable doubt that Cardona intentionally agreed to work with the other conspirators towards a common goal--the laundering of illegal drug proceeds. Accordingly, we will uphold Cardona's conviction on the conspiracy count.

III.

In addition to being convicted on the conspiracy count, Carr was also convicted of Count 21, attempted money laundering, and Count 22, failing to file an export currency transaction report. On appeal Carr challenges only his convictions on the conspiracy count and the attempted money laundering count.

We can sustain Carr's conviction on the conspiracy count if, in addition to determining that the government provided sufficient evidence to prove that he agreed with the conspirators to launder money, there was sufficient evidence for a jury to conclude beyond a reasonable doubt that he was guilty of attempted money laundering as charged in Count 21 because this count corresponds to the third object of the conspiracy. See Griffin, __ U.S. at __, 112 S. Ct. at 469-74. Hence, we will first turn to the evidence of guilt on that count.

In Count 21, the government charged Carr with attempting to transport $186,000 out of the country on July 11, 1990 in violation of the Anti-Money Laundering Act of 1986, 18

17

U.S.C. § 1956(a)(2)(B).  This criminal statute provides in relevant part:

> Whoever . . . attempts to transport . . . funds from a place in the United States to or through a place outside the United States . . .--
>
> . . .
>
>> (B) knowing that the . . . funds involved in the transportation . . . represent the proceeds of some form of unlawful activity and knowing that such transportation is designed in whole or in part--
>>> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;
>>> . . .
>
> shall be sentenced to a fine . . . or imprisonment . . . or both.

Id. § 1956(a)(2)(B)(i).  This criminal statute contains two scienter elements as reflected by Congress' use of the term "knowing" twice in the language of the section.  See id.  On appeal, Carr argues that the evidence was insufficient for a rational trier of fact to find beyond a reasonable doubt that he had either component of the scienter required for a conviction under the statute.

The first scienter element in the statute required proof that Carr knew the $186,000 in cash he was carrying on July 11, 1990 "represent[ed] the proceeds of some form of unlawful activity."  Id. § 1956(a)(2)(B).  This clause is not specifically defined in the statute, although an analogous clause from §1956(a)(1), criminalizing the laundering of property representing the proceeds of unlawful activity, is defined in § 1956(c)(1):

> [T]he term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the

18

> property involved in the transaction represented proceeds of
> some form, though not necessarily which form, of activity
> that constitutes a felony under State, Federal, or foreign
> law.

18 U.S.C. § 1956(c)(1).

The only distinction between subsections 1956(a)(1) and 1956(a)(2)(B) is that the former criminalizes the laundering of property, rather than funds. Because we find this distinction so slight, we believe that Congress intended the definition of §1956(c)(1), which is quoted above, to apply equally to violations of the money laundering statute which involve funds instead of property. Relying on this definition, we hold that the requisite scienter element is established in the present case if the evidence shows beyond a reasonable doubt that Carr knew the funds he was carrying represented the proceeds of any form of unlawful activity which is a felony under state, federal, or foreign law. See United States v. Isabel, 945 F.2d 1193, 1201 & n.13 (1st Cir. 1991);[0] see also United States v. Koller, 956 F.2d

---

[0] The legislative history does not directly reveal what Congress intended as to this first scienter element because no congressional reports were submitted with the Anti-Drug Abuse Act of 1986, which contained the Anti-Money Laundering Act of 1986. See 1986 U.S.C.C.A.N. 5393; United States v. Stavroulakis, 952 F.2d 686, 691 (2d Cir. 1991), cert. denied, __ U.S. __, 112 S. Ct. 1982 (1992). A related Senate report, however, indicates that Congress intended to criminalize all transfers of monetary proceeds derived from any crime designated a felony under state or federal law:

> [T]he defendant need not know exactly what crime generated
> the funds involved in a transaction, only that the funds are
> the proceeds of some kind of crime that is a felony under
> Federal or State law. This will eviscerate the defense that
> a defendant knew the funds came from a crime, but thought
> the crime involved was a crime not on the list of
> "specified" crimes in section (c)(7).

1408, 1411 (7th Cir. 1992); United States v. Mickens, 926 F.2d 1323, 1330 (2d Cir. 1991), cert. denied, __ U.S. __, 112 S. Ct. 940 (1992).

The actual money Carr was carrying on July 11, 1990 was not directly derived from drug sales; it had been withdrawn from a U.S. government bank account and was provided to Javier Gonzalez by an agent of the government. However, the fact that the money Carr was transporting was not the actual proceeds of unlawful activity is made irrelevant by Congress' use of the word "represent" in the statute. After the exchange of money derived from illegal drug sales for fresh $100 bills provided by the cooperating witness, the $100 bills transported by Carr clearly represented the illegal drug money. Because the crime of money laundering by its very nature involves the change of criminal profits into other forms of currency or property, we believe Congress intended a criminal defendant to be convicted under this statute when the actual funds involved in the attempted transportation "represent" the proceeds of some unlawful activity. 18 U.S.C. § 1956(a)(2)(B); see also United States v. Jackson, 935 F.2d 832, 840 (7th Cir. 1991) (defendant need only know that the transaction "involved" the proceeds of unlawful activity). In order to convict a defendant for a violation of §1956(a)(2)(B), it is sufficient that the government prove the defendant believed the money involved was derived from an illegal

---

S. Rep. No. 433, 99th Cong., 2d Sess. 12 (1986).

20

activity, even though, in fact, the funds came from a government source.

Carr argues that the government failed to prove beyond a reasonable doubt that he knew the money he was carrying represented proceeds of illegal activity.  In reviewing the record, we find two appropriate and independent illegal activities that the jury could reasonably have relied on to conclude that Carr knew the funds represented some form of criminal proceeds.  First, Javier Gonzalez engaged in an uncharged illegal domestic money laundering exchange of $190,000 with the cooperating witness two days before Carr was stopped in Miami.  Although there is no evidence establishing Carr's presence at this exchange, circumstantial evidence including recorded phone conversations between Carr and other conspirators described at supra pp. 7-8, his travel with Javier Gonzalez on a scheduled flight to Colombia just two days later, and his possession of $186,000 in $100 bills with serial numbers matching those provided by the cooperating witness provided sufficient evidence for a rational jury to find beyond a reasonable doubt that Carr knew the cash represented proceeds derived from that illegal money laundering exchange.[0]

---

[0]In his brief, Carr notes that the government did not charge him under this theory in the indictment.  Brief for Appellant (Carr) at 19 n.11.  This is apparently so because, as we have previously discussed, the statute requires only proof that the defendant knew the money represented proceeds of some (meaning "any") unlawful conduct.  In fact, the indictment on this count did not, and need not, allege any specific unlawful conduct that the defendant knew generated the proceeds.

Independent of this theory, there was also sufficient circumstantial evidence for a rational jury to find beyond a reasonable doubt that Carr knew the cash he was carrying represented proceeds from drug trafficking. We agree with the Court of Appeals for the Eighth Circuit that in order to convict a person for laundering or attempting to launder drug money, the government need not "trace the proceeds to a <u>particular</u> [drug] sale." <u>United States v. Blackman</u>, 904 F.2d 1250, 1257 (8th Cir. 1990). Thus, it was proper for the government to prove Carr's knowledge of the criminal nature of the cash proceeds entirely through circumstantial evidence.

Drawing all evidentiary inferences in favor of the government, we note that the jury heard testimony concerning Carr's numerous trips to the Cayman Islands and Colombia just after cash exchanges took place between Javier or Doris Gonzalez and the cooperating witness. Carr admitted to knowing and frequently travelling with Javier Gonzalez, the ringleader of this money laundering conspiracy.[0] The jury heard about an occasion when Carr lied to passport officials in order to obtain a new passport which would not contain numerous stamps showing visits of short duration to Colombia. Evidence also shows that Carr lied to Customs officials about how he obtained the blue bag containing the $180,000 in $100 bills that was confiscated in

[0]Evidence of an intimate association with the conspiracy ringleader is a factor relied on by one court of appeals to sustain a conviction for money laundering in a sufficiency of evidence attack. <u>See</u> <u>United States v. Cota</u>, 953 F.2d 753, 760 (2d Cir. 1992).

22

Miami on July 11, 1990.[0]  Taped phone conversations from both

before the flight and after the money was confiscated, described

at supra pp. 7-8, provide incriminating evidence that Carr knew

the money he was carrying had been derived from illegal

transactions.  Furthermore, positive alerts by trained drug

sniffing dogs indicate that much of the money likely was used in

drug transactions.  Thus, we cannot say that a rational jury

could not find beyond a reasonable doubt that Carr knew the money

he was carrying represented proceeds of illegal drug trafficking.

The second disputed scienter element of the statute

required proof that Carr knew that his act of transporting the

funds was "designed in whole or in part to conceal or disguise

the nature, the location, the source, the ownership, or the

control of the proceeds of specified unlawful activity."  18

U.S.C. § 1956(a)(2)(B)(i).  "Specified unlawful activity" is

broadly defined in the statute as meaning any act or activity

that is a specifically listed felony crime.  Id. § 1956(c)(7).

The listed felony offenses include drug trafficking.  See id.

§1956(c)(7)(C).

In order to convict Carr under Count 21, the government

was not required to prove that Carr knew the money he was

carrying was "the proceeds of specified unlawful activity," id.

§1956(a)(2)(B)(i).  Rather, the statute requires only that Carr

---

[0]Lying to law enforcement officers might provide insufficient
evidence of guilt standing alone, but in conjunction with other
evidence, lying provides an allowable inference of guilt to
sustain a conviction in a sufficiency of evidence challenge.  See
Cota, 953 F.2d at 760-61; United States v. Gallo, 927 F.2d 815,
822 (5th Cir. 1991).

knew his act of transporting the funds was designed to disguise or conceal its nature, source, ownership, or control. See United States v. Campbell, 977 F.2d 854, 857 (4th Cir. 1992) (interpreting the analogous property money laundering subsection, 18 U.S.C. § 1956(a)(1)(B)(i)), cert. denied, __ U.S. __, 113 S. Ct. 1331 (1993); United States v. Massac, 867 F.2d 174, 177-78 (3d Cir. 1989) (same).

We agree with one court of appeals which has interpreted this scienter element to allow for a conviction under the money laundering statute not only where the defendant has personally designed the transaction with intent to disguise the funds, but also where the defendant knows someone else designed the transaction intending to disguise the funds. See United States v. Awan, 966 F.2d 1415, 1424-25 (11th Cir. 1992) (quoting United States v. Ortiz, 738 F. Supp. 1394, 1401 (S.D. Fla. 1990)). Under such an interpretation, the government must prove that the defendant knew that the funds were derived from an unlawful activity and that the defendant knew the transportation was undertaken to disguise or conceal the money in some material fashion. See id. at 1424-25. In Awan, the court overturned the conviction of a money laundering defendant because there was insufficient evidence to prove that he knew that the other conspirators had designed complicated banking transactions to disguise or conceal the source of the money. Id. at 1433-35.

The evidence presented by the government was sufficient for a rational jury to find Carr guilty beyond a reasonable doubt under such a theory. Evidence was presented that on July 11,

24

1990 Carr received the blue carry-on bag at the Philadelphia International Airport from Javier Gonzalez. When asked to declare all monetary instruments in excess of $10,000 at the Miami Airport, Carr stated that he had only $4,000 in cash. A subsequent consensual search of Carr's blue carry-on bag revealed $180,000 in cash secreted in two coffee thermos mugs and a talcum powder container. In addition, Carr was carrying $6,000 in $100 bills on his person. When asked how he came to possess the bag, Carr told Customs officials a highly suspicious, if not incredible, story that he had received an anonymous phone call telling him to retrieve it from a train station locker and to transport it to Colombia. By returning a guilty verdict on this count, the jury obviously resolved a credibility issue in favor of the government. It is not our role to disturb that determination on appeal. In sum, we conclude that all of this evidence was sufficient for a jury to find beyond a reasonable doubt that Carr knew Gonzalez had designed this currency transportation scheme in a manner to conceal or disguise the nature, source, or ownership of the money.

Thus, we will affirm Carr's conviction on the money laundering count which arose from his attempted transportation of $186,000 to Colombia on July 11, 1990. We also conclude that the evidence presented to the jury was sufficient to prove beyond a reasonable doubt that Carr agreed with the other conspirators to participate in the money laundering conspiracy. Because there is ample evidence to support his conviction on Count 21, which corresponds to the third object of the money laundering

25

conspiracy, we will also affirm his conviction on the conspiracy count.  See Griffin, __ U.S. at __, 112 S. Ct. at 469-74.

IV.

A.

Carr and Cardona appeal the sentences imposed by the district court.  Both argue pursuant to United States Sentence Commission, Guidelines Manual, § 3B1.2 (1993) ("U.S.S.G.") that the district court erred in denying their request for a downward adjustment in the guideline offense level on the basis of playing a "mitigating role" in the money laundering conspiracy.  This guideline states:

> Based on the defendant's role in the offense, decrease the offense level as follows:
> (a)  If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
> (b)  If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
> In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2.  Carr requested a 2 level reduction for being a minor participant.  Cardona requested a 2, 3, or 4 level reduction for being a minimal or minor participant in the conspiracy.  In each case, the district court rejected the requested base level reduction.

We employ a mixed standard of review when considering whether a defendant was entitled to a base level reduction for being a minimal or minor participant in the criminal activity. United States v. Bierley, 922 F.2d 1061, 1064 (3d Cir. 1990); United States v. Ortiz, 878 F.2d 125, 126-27 (3d Cir. 1989). When the district court's denial of a downward adjustment is based

26

primarily on a legal interpretation of the Guidelines the defendant claims to be erroneous, we exercise plenary review. Bierley, 922 F.2d at 1064. By contrast, when the defendant takes issue with the district court's denial of a reduction for being a minimal or minor participant which was based primarily on factual determinations, we review only for clear error. United States v. Price, 13 F.3d 711, 735 (3d Cir. 1994), cert. denied, 62 USLW 3755 (U.S. May 16, 1994); Bierley, 922 F.2d at 1064; see also U.S.S.G. § 3B1.2, comment. (backg'd.) (the decision to adjust downward for minor or minimal participation, or the intermediate alternative, "involves a determination that is heavily dependent upon the facts of a particular case").

Carr argues that the district court erred for two independent reasons. First, he contends that his role in his "relevant conduct" was minor as defined in U.S.S.G. § 3B1.2. "[A] minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n.3); see also United States v. Tsai, 954 F.2d 155, 166-67 (3d Cir.) (discussing definition of "minor participant"), cert. denied, __ U.S. __, 113 S. Ct. 93 (1992).

Assuming, arguendo, that the district court properly limited his relevant conduct to the activities surrounding his conviction on Count 21 (attempted money laundering), Carr argues that his role as a mere courier was minor as compared to the roles of the other conspirators involved who sold drugs and shared profits in either the trafficking or money laundering.

27

Since the district court's determination that Carr's role as a courier was not minor in comparison to the other conspirators involved in the attempted money laundering activity is primarily factual in nature, we review it only for clear error.

In United States v. Headley, 923 F.2d 1079, 1084–85 (3d Cir. 1991), we recognized that defense counsel representing a defendant who served as a drug courier for a large conspiracy on only a few occasions was ineffective for failing to argue that the defendant was entitled to consideration for a base level adjustment for being a minor participant. In remanding the case for a consideration of this issue, we gave some guidance to the district court as to whether a courier should be considered a minor participant:

> [T]he culpability of a defendant courier must depend necessarily on such factors as the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise.

Id. at 1084 (quoting United States v. Garcia, 920 F.2d 153, 155 (2d Cir. 1990)). We noted that the ultimate conclusion as to whether a courier is a minor participant involves making various factual findings, id., which we should review only for clear error on appeal.

Although the district court did not specifically follow the course set out in Headley, the record amply supports the district court's conclusion that Carr was not a minor participant. Carr was stopped in Miami with cash of $186,000 in $100 bills. That attempted transportation to Colombia provided

28

the basis for his conviction on Count 21.  Evidence shows that Carr was travelling with Javier Gonzalez, the kingpin of the conspiracy, that Carr and Gonzalez were closely associated, and that Carr knew the funds represented proceeds of some criminal activity.  In light of the fact that the particular money laundering transaction might not have taken place if Carr was not physically transporting the cash on his person and in his carry-on bag, Carr was certainly vital to its success.  See United States v. Fuller, 974 F.2d 1474, 1479 (5th Cir. 1992) ("If [the defendant] had made delivery of the money the crime would have been perfected."), cert. denied, __ U.S. __, 114 S. Ct. 112 (1993).  Furthermore, we acknowledged in Headley that "[t]he fact that a defendant's participation in a [conspiracy] was limited to that of courier is not alone indicative of a minor or minimal role."  923 F.2d at 1084.  Accordingly, on this record we conclude that the district court's determination that Carr was not a minor participant was not clearly erroneous.

Carr also submits that his sentence must be vacated pursuant to 18 U.S.C. § 3742(f)(1) because the district court misapplied the Guidelines by relying on a broader scope of relevant conduct than that contained in his Presentence Investigation Report ("PSR").[0]  Carr argues that the district

---

[0]Carr's Presentence Investigation Report calculates his base offense level from U.S.S.G. § 2S1.1(a)(2), the operative guideline for persons convicted of laundering money.  Since all of Carr's counts of conviction were grouped together for sentencing purposes pursuant to U.S.S.G. § 3D1.2(a) and (b), Carr's relevant conduct was only that which gave rise to his conviction on Count 21, the money laundering count--namely the

court misapplied the definition of "minor participant" by not limiting his relevant conduct to the attempted money laundering act that took place on July 11, 1990.  In essence, on appeal Carr objects to the following statement made by the district court at the sentencing hearing:

> [I]n Mr. Carr's case, the Court thinks that he is absolutely in no way, shape or form, a minimal or a minor participant. He was a significant participant.  This is a man who the testimony show [sic] made numerous trips to Colombia of one or two days in duration.  This man was laundering money on a routine and regular basis with and for the kingpin of his [sic] money-laundering operation.

App. (Carr) at 223.  According to Carr, this statement reflects the district court's reliance on all of his conduct with respect to the conspiracy, rather than just his limited relevant conduct with respect to his attempted money laundering conviction, in denying the mitigating role adjustment.

Carr, however, was given an immediate opportunity but did not object to the district court's statement.  Nor has counsel for Carr otherwise brought to our attention that the record contains an objection made in the district court that it was impermissibly relying on relevant conduct other than that contained in the PSR.  Thus, Carr failed to preserve the issue for appeal and we review only to ensure that "plain error" was not committed.  United States v. Pollen, 978 F.2d 78, 88 (3d Cir. 1992) (citing Fed. R. Crim. P. 52(b)), cert. denied, __ U.S. __, 113 S. Ct. 2332 (1993).

---

events leading to the confiscation of $186,000 in $100 bills from Carr at the Miami Airport on July 11, 1990.

Upon review of the entire sentence hearing record, we do not believe that the district court committed an error "seriously affect[ing] substantial rights or compromis[ing] the fairness of the proceedings," United States v. Martinez-Zayas, 857 F.2d 122, 134 (3d Cir. 1988). Carr's relevant conduct for purposes of sentencing was only that which occurred on July 11, 1990 during his attempted transportation of $186,000 in cash to Colombia. Nevertheless, we have already concluded that there are ample facts tending to show that Carr was not a minor participant with respect to this particular transaction. In fact, the very success of the transportation of the $186,000 in $100 bills to Colombia was dependent upon Carr's role as the courier. Therefore, although the district court may have committed error in denying Carr's request for a mitigating adjustment based on relevant conduct that was not contained in the PSR, we cannot say that the district court's conclusion in denying Carr a two base level reduction for being a minor participant was plain error.

Cardona maintains that he was entitled to as much as a four base level mitigating adjustment for being a minor participant in the overall conspiracy. Like Carr, he contends that the district court erred in taking into account a broader scope of relevant conduct than that contained in the PSR. With respect to Cardona's request for a mitigating adjustment, the district court stated:

Well, the Court's rather familiar with the testimony and the evidence that was educed in this case since there was a full blown trial that lasted almost a month. No, I don't think that one could find by a preponderance of the

> evidence that this gentleman was anything other than an average participant.
>
> I don't think that his role in the overall conduct charged here was substantially less or even significantly less than that of most of his cohorts. . . .
>
> I think the evidence shows that even being most generous of [sic] the defendant, he was an average run of the mill participant in this conspiracy and I think that accordingly he is not entitled to a two or a three or a four point adjustment for being a minor or minimal participant.

App. (Cardona) at 158–59. We disagree with Cardona's reading of this statement as indicating that the district court erroneously relied on conspiratorial conduct that was not part of Cardona's relevant conduct as contained in his PSR. Rather, we believe this statement reflects the district court's proper application of the mitigating adjustment guideline by comparing Cardona's culpability in his relevant conduct with other conspirators involved in those particular transactions.

Furthermore, in reviewing all of the evidence relating to Cardona's relevant conduct, we agree with the district court's conclusion that he was at least an average participant. The district court did not commit clear error in concluding that Cardona was not entitled to any mitigating adjustment for his role in the conspiracy.

### B.

Cardona also argues that his sentence should be vacated because the district court improperly enhanced his base offense level by three levels pursuant to U.S.S.G. § 2S1.1(b)(1). This guideline provides for a three base level enhancement for defendants convicted of money laundering who "knew or believed

32

that the funds were the proceeds of an unlawful activity involving the . . . distribution of narcotics or other controlled substances." Id. After considering Cardona's objection to this sentence enhancement, the district court stated:

> The question is, is there enough from which one could find, that he knew the currency he was dealing in represented the proceeds of drug trafficking activity. It's the Court's view that there is.
>
> In fact, I'm not going to g[o] bit by bit and piece by piece [through the evidence], but the totality of the evidence is such as to suggest that not only did the defendant know that the proceeds that he was dealing were derived from drug trafficking activity. They were derived from drug trafficking activity in which he was engaged and I think that the probation officer correctly awarded the three points. I find by at least a preponderance of the evidence that this is a proper offense characteristic and a proper enhancement.

App. (Cardona) at 156. Cardona takes issue with the conclusion of the district court that the totality of the evidence establishes that Cardona knew the money he was involved with constituted proceeds of drug dealing. Since in our view this conclusion is primarily a factual determination, we review it only for clear error. See United States v. Cusumano, 943 F.2d 305, 313 (3d Cir. 1991), cert. denied, __ U.S. __, 112 S. Ct. 881 (1992).

The evidence shows that in 1990 Cardona wired significantly more money to Colombia than he reported on his federal tax return. He was seen entering Jav G. Travel several times during the time period in which cash exchanges were taking place between Javier Gonzalez and the cooperating witness, while business records reveal no legitimate reasons for the visits. Furthermore, large sums of small denomination bills were found in

33

Cardona's residence, as well as drug packaging materials, on the date of his arrest. The confiscated cash was further revealed by trained dogs to contain traces of illegal narcotics. Considering all of this evidence, we conclude that the district court did not commit clear error in finding that Cardona knew the laundering proceeds came from illegal drug transactions. The district court properly enhanced Cardona's base offense level by three levels pursuant to U.S.S.G. § 2S1.1(b)(1).

### C.

Carr also challenges that portion of his sentence where the district court imposed a $10,000 fine. Carr was convicted of three counts which together called for a fine in the range of $10,000 to $1,000,000. Therefore, the fine actually imposed by the district court was the minimum amount called for by the Sentencing Guidelines. When assessing a fine, the district court is required to consider several factors which are specified by statute, see 18 U.S.C. §§ 3553(a) and 3572(a), as well as factors contained in the Sentencing Guidelines themselves, see U.S.S.G. §5E1.2(d)(1)-(7). Nevertheless, the district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a).

After receiving the PSR recommending a fine of $10,000, Carr filed a sentencing memorandum requesting that the fine be waived entirely pursuant to U.S.S.G. § 5E1.2(f). Central to Carr's argument before the district court, and on appeal, is that

34

the PSR reflects that Carr had a negative net worth of about $20,000, and a negative net monthly cash flow because he was unemployed just prior to sentencing. At the sentencing hearing, the district court acknowledged that Carr did not presently have the means to pay the $10,000 minimum fine. Upon review of Carr's potential future resources, however, the district court imposed the fine because the judge could not conclude that "there's no reasonable prospect in the foreseeable future that [Carr] could not pay at least the absolute minimum fine. So, I am going to impose the minimum fine that I'm required by law to impose." App. (Carr) at 239.

Carr filed a Motion for Correction of Sentence pursuant to Fed. R. Crim. P. 35(c) with the district court in which he argued that the fine should be waived because the government had not objected to the financial information contained in the PSR report which reflected Carr's negative net worth. In addition, Carr argued that a full consideration of all the relevant factors contained in the statute and Guidelines yields the conclusion that the $10,000 fine was beyond his future means. Finally, Carr contended the installment period for payment of the fine was illegal and that interest should be waived because of Carr's present inability to pay.

The district court rejected most of these arguments in an order dated April 26, 1993 because "the court must impose a fine unless defendant establishes that he is not likely to become able to pay any fine," which Carr failed to do. District Court Order (Crim. No. 92-00102-08) (E.D. Pa. Apr. 26, 1993) (citing

35

U.S.S.G. § 5E1.2(a) and (f)), reprinted in Brief for Appellant (Carr) at Addendum C. The district court also reviewed several relevant factors including Carr's responsibility for dependents, educational background, employment history, and net worth in concluding that Carr would likely have the means to pay the minimum fine of $10,000 in the future. The record reflects that Carr graduated from high school, attended college for three years, and had been employed in administrative positions in the airline industry for several years prior to the events which gave rise to his criminal conviction. In this review, the district court noted that Carr's net worth was approximately $20,000 when an undocumented, unsecured $30,000 loan payable to his mother was subtracted from his total liabilities. The district court did, nevertheless, waive interest on the fine.

Carr argues that this portion of his sentence must be vacated because the district court committed error by recalculating his net worth by adding back the uncorroborated $30,000 loan payable to his mother. Furthermore, Carr contends that the district court incorrectly placed the burden on the defendant to establish his inability to pay the fine where neither Carr nor the government objected to that portion of the PSR which revealed that Carr had a negative net worth of $10,000. We note, initially, that this is not a situation where we review the record de novo to ascertain whether the district court made any findings to show that it considered whether the defendant had the ability to pay the fine imposed. Cf. United States v. Demes, 941 F.2d 220, 223-24 (3d Cir.) (vacating sentence because the

district court failed to make findings with respect to defendant's ability to pay fine), cert. denied, __ U.S. __, 112 S. Ct. 399 (1991); United States v. Cammisano, 917 F.2d 1057, 1064 (8th Cir. 1990) (same). Rather, we exercise plenary review over the alleged legal errors, but review conclusions which are largely factual in nature only for clear error. The district court's ultimate conclusion of whether to waive or reduce the fine is reviewed only for an abuse of discretion because the relevant Guideline indicates that the district court should retain discretion. See U.S.S.G. § 5E1.2(f).

The sentencing record in the present case plainly reveals that the district court considered those statutory and guideline factors that it found relevant in determining that Carr possessed the ability to pay the $10,000 minimum fine in the future. Imposing a fine based solely on future ability to pay is permissible. See United States v. Joshua, 976 F.2d 844, 856 (3d Cir. 1992) (sentence imposing a fine based on future ability to pay upheld on appeal where district court made a finding that defendant was a judgment creditor). Furthermore, we hold that it is permissible for a sentencing court sua sponte to recalculate a defendant's net worth in considering whether the defendant has the ability to pay a fine where the PSR actually recommends that a fine be imposed.

In the present case, although the PSR reported that Carr had a negative net worth, it still recommended that the district court impose a $10,000 fine. Thus, Carr was on notice before the sentencing hearing that the government was

37

recommending that the court impose a fine of $10,000 despite the fact that his current financial position indicated he would be unable to make a lumpsum payment of the fine.[0] As the district

---

[0]In presenting this issue, Carr cites to several cases which he contends hold that a defendant may establish inability to pay a fine by reference to the PSR alone, without any independent requirement to present additional evidence. See United States v. Fair, 979 F.2d 1037, 1041 (5th Cir. 1992); United States v. Rivera, 971 F.2d 876, 895 (2d Cir. 1992); United States v. Labat, 915 F.2d 603, 604-07 (10th Cir. 1990). None of these cases stand for such a broad proposition and all are distinguishable.

In Fair, the court held only that the district court must make findings when the court adopts the facts contained in the PSR, but then decides to depart from its recommended fine or sentence. 979 F.2d at 1041. The district court in the present case actually imposed a fine which was recommended in the PSR. In Rivera, the court vacated a sentence imposing a $17,500 fine and remanded for reconsideration given that the district court seemed to believe the PSR recommended a fine, when the PSR actually concluded that the defendant was unable to pay a fine. 971 F.2d at 895. Here, the PSR unambiguously recommended a $10,000 fine which was imposed by the district court only after making findings concerning Carr's future ability to pay. In Labat, the court vacated a sentence containing a fine of over $110,000 where the PSR, as introduced without objection, indicated that the defendant should be considered indigent and would only be able to pay a fine from the lower end of the guideline range. 915 F.2d at 604-06. More fundamentally, the court vacated the sentence because the fine was imposed as an "additional fine" for purposes of compensating the government for the costs of incarceration, which the court held can be only appropriately imposed when the defendant has the ability to pay a punitive fine. Id. at 606-07. By contrast, Carr's PSR contains facts, which the district court adopted, tending to show that he has some future means and ability to pay the fine, which is punitive in nature.

Thus, none of these cases provide persuasive authority for the rule Carr advances: when considering the guideline factors as to whether a defendant has the ability to pay a fine which is recommended in the PSR, a district court may not individually scrutinize factual evidence contained in the PSR which has not been objected to by either the government or the defendant. Adoption of such a rule would extinguish one of the few remaining vestiges of discretion left with district judges in sentencing criminal defendants pursuant to the Guidelines.

court correctly stated, a defendant is only entitled to a reduction or waiver of the fine if he proves that he is unable to pay currently and is not likely to be able to pay in the future. U.S.S.G. § 5E1.2(f). Even then, the Guidelines leave discretion with the district court to decide whether the fine should be reduced or waived. Id. ("If the defendant establishes that . . . he is not able and . . . is not likely to become able to pay [the fine] . . ., the court may impose a lesser fine or waive the fine." (emphasis added)). Therefore, the district court made no legal error in recalculating Carr's net worth or in leaving with him the burden of proving he had no future ability to pay the minimum fine.

Although Carr naturally relied on the fact that the government did not object to this portion of the PSR, and thereby did not present any evidence tending to establish or corroborate the undocumented loan and negative net worth, he still retained the overall burden of proving that he did not possess the ability to pay the recommended fine in the future. See U.S.S.G. §5E1.2(a); Joshua, 976 F.2d at 856; United States v. Preston, 910 F.2d 81, 89-90 (3d Cir. 1990), cert. denied, 498 U.S. 1103, 111 S. Ct. 1002 (1991). The district court concluded that Carr did not meet that burden even after considering Carr's motion for correction of sentence in which he argued that he did not have the means to pay the fine in the future in part because of his negative net worth.

Our review of the sentencing record reveals that the district court made no clearly erroneous factual findings in

39

concluding that Carr had some future ability to pay the minimum fine.  Given that the district court made no legal error and considered the relevant factors as to Carr's future capacity to pay the fine, which are reflected on the record, it certainly did not abuse its discretion in failing to waive the $10,000 fine altogether.[0]

V.

The convictions and sentences of both Carr and Cardona will be affirmed.

---

[0] We would be faced with a very different question if the district court had recalculated the defendant's net worth as presented in the PSR and imposed a fine when none was recommended in the PSR and when the government raised no objection.  In such a case, a defendant might have a legitimate claim that the PSR by itself establishes an inability to pay a fine.  However, we are not faced with that scenario in this case and we express no opinion as to how that issue should be decided.

United States v. Carr, Nos. 93-1376/1383


BECKER, Circuit Judge, concurring in part and dissenting in part.

I join in the majority's opinion except for its discussion of the canine sniff

evidence and the portions of Part III and Part IV pertaining to the sufficiency of

evidence supporting Carr's conviction on Count 21. I write separately not only to

why I believe the majority has construed 18 U.S.C.A. §1956(a)(2)(B)(i) too broadly

also to express my views on the general inadmissibility of canine sniffing evidence


### I. CONSTRUCTION OF 18 U.S.C.A. § 1956(A)(2)(B)(I)

#### A. §The Plain Meaning of the Statute

Section 1956(a)(2)(B)(i) makes it a crime to transport money out of the United

"knowing that the . . . funds . . . represent the proceeds of some form of unlawful

activity and knowing that such transportation . . . is designed . . . (i) to concea

disguise the nature, the location, the source, the ownership, or the control of the

proceeds of specified unlawful activity . . . ." 18 U.S.C.A. § 1956(a)(2)(B)(i) (e

supplied). Unfortunately, the language does not clearly convey whether the mens re

requirement of "knowing" applies solely to the fact that the transportation was "de

to "conceal or disguise" attributes of what really is proceeds of specified unlawfu

activity -- rendering the "proceeds of specified unlawful activity" language a mere

passing referent to which no mens rea requirement attaches -- or whether the scient

requirement extends also to the fact that the funds represented "the proceeds of sp

unlawful activity." Although the drafting of the statute is opaque, and the questi

1

the mens rea requirement a close one, I respectfully disagree with the majority's construction, see Maj. Op. at 23-24.

After careful meditation on the structure and wording of §1956(a)(2)(B)(i), I to conclude in the end that the mens rea of "knowing" also applies to the fact that funds represent the proceeds of "specified unlawful activity" and that the majority reading cabining the mens rea requirement to the "conceal or disguise" element is persuasive. I find guidance in the Model Penal Code's learned approach toward culpability. The Model Penal Code's rule of statutory construction provides that " the law defining an offense prescribes the kind of culpability that is sufficient f commission of an offense, without distinguishing among the material elements thereo provision shall apply to all the material elements of the offenses, unless a contra purpose plainly appears." MODEL PENAL CODE § 2.02(4) (1965). "Knowing" applies to a material elements of subsection (i) under that rule, and because it identifies the of the offense the "proceeds of specified unlawful activity" (as defined by §1956(c element is a material term.[0]

This construction does not read the phrase "some form of unlawful activity" in 1956(a)(2)(B) out of the statute: that broader language applies to § 1956(c)(2)(B) which does not contain the language "proceeds of specified unlawful activity."[0] Ha

---

[0] I do not mean to suggest that the government is obliged to prove knowledge of unlawfulness or that the government must prove that the defendant knew that the sta defines as "specified unlawful activities" what the defendant knew the proceeds de from. I only mean that the government must prove that the defendant knew that the in fact (but not in law) represented the proceeds of one of the great many forms of "specified unlawful activities" enumerated in § 1956(c)(7).

[0] That subsection makes it a crime to transport funds in to or out of the United Sta "(B) knowing that the . . . funds involved in the transportation . . . represent th proceeds of some form of unlawful activity and knowing that such transportation is

2

Congress meant to have the scienter requirement in § 1956(a)(2)(B)(i) apply only to proceeds of "some form of unlawful activity" and not to "proceeds of specified unla activity," it could (and should) have used the language "some form of unlawful acti in § 1956(a)(2)(B)(i) instead of the language "proceeds of specified unlawful activ or otherwise conveyed that meaning.

For example, in § 1956(a)(1), Congress partially drafted the statute the way t majority interprets § 1956(a)(2) to read. That section begins, "Whoever, knowing th property involved in a financial transaction represents the proceeds of <u>some form of unlawful activity</u>, conducts or attempts to conduct such a financial transaction whi fact involves the proceeds of specified unlawful activity . . . ."  18 U.S.C.A. § 1956(a)(1) (Supp. 1994) (emphasis supplied).  The majority reads §1956(a)(2)(B)(i) it similarly read "knowing that such transportation . . . is designed . . . to cond disguise the nature, the location, the source, the ownership, or the control of <u>wha fact represents</u> proceeds of specified unlawful activity," whereas the statute as wr leaves out the underlined words.

The case the majority relies upon to support its construction, <u>United States v Massac</u>, 867 F.2d 174, 177-78 (3d Cir. 1989), did not decide the issue the majority it for.  In that case there was no question that the defendant knew the proceeds de from drug trafficking; the only question we confronted was whether the transaction designed to conceal or disguise that fact.

B.  <u>Application of the Rule of Lenity</u>

designed in whole or in part . . . (ii) to avoid a transaction reporting requiremen State or Federal law").  <u>See</u> 18 U.S.C.A. § 1956(a)(2)(B)(ii) (Supp. 1994).

3

Even if ultimately I am wrong about the difficult question concerning the mens

standard for the element "proceeds of specified unlawful activity" in § 1956(a)(2)

it seems to me that at the very least the statute's mens rea requirement is ambigu

Therefore the rule of lenity should come into play and require the same outcome I r

above.

The Supreme Court has held that the rule of lenity should be employed to "reso

any ambiguity in the ambit of [a criminal] statute's coverage." Crandon v. United

494 U.S. 152, 158, 110 S. Ct. 997, 1001 (1990) (emphasis supplied).[0] An ambiguity

for purposes of the rule in "those situations in which a reasonable doubt persists

statute's intended scope even after resort to `the language and structure, legislat

history, and motivating policies' of the statute." Moskal v. United States, 498 U.S.

108, 111 S. Ct. 461, 465 (1990) (quoting Bifulco v. United States, 447 U.S. 381, 38

S. Ct. 2247, 2252 (1980)); see Crandon, 494 U.S. at 158, 110 S. Ct. at 1001-02.

Since there is no legislative history, and since neither the language, structu

the animating purposes of the statute provide sure direction, see supra Part **Error!**

**Bookmark not defined.**, the statute is at best ambiguous.  Therefore the rule of ler

mandates that the heightened scienter requirement, rather than no scienter requiren

the majority would have it), applies to that element of the offense.

---

[0]This Court has recurrently echoed the same view.  See Government of V.I. v. Knight

F.2d 619, 633 (3d Cir. 1993) ("The rule of lenity requires that any ambiguity conce
the meaning of a criminal statute be resolved in favor of the criminal defendant."
(emphasis supplied)), cert. denied, 114 S. Ct. 556 (1993); United States v. Tabaka,
F.2d 100, 103 (3d Cir. 1992) (same); United States v. Knox, 977 F.2d 815, 819 (3d C
1992) (same), vacated on other grounds, 114 S. Ct. 375 (1993); United States v. Mok
956 F.2d 450, 452 (3d Cir. 1992) (same); cf. 3 NORMAN J. SINGER, STATUTES AND STATUTORY CO
TION § 59.04, at 118 (5th ed. 1992 rev.) ("The words of a criminal statute must leav
reasonable doubt as to its meaning or the intention of the legislature, and where s
doubt exists the liberty of the citizen is favored." (footnotes omitted)).

II. THE RELEVANCE OF CANINE-ALERT EVIDENCE

Although I believe that the introduction of the dog-sniffing evidence was err

does not rise to the level of plain error, inasmuch as I also believe there was suf

evidence to prove beyond a reasonable doubt that the cash involved represented the

proceeds of drug trafficking even absent the canine-sniffing evidence, and hence th

evidence was not prejudicial.[0] Moreover, the question whether the currency in fact

represented the proceeds of drug trafficking is not relevant to the question of whe

Carr subjectively believed he was transporting currency derived from drug traffick

order to launder it. Nevertheless, I feel obliged to comment on the nature of the e

in light of what I believe to be its its highly prejudicial potential in future pro

ings.[0]

My concern stems from numerous studies and other evidence cited in United Stat

Fifty-Three Thousand Eighty-Two Dollars in United States Currency, 985 F.2d 245, 25

---

[0]See FED. R. CRIM. P. 52(b); e.g., United States v. Young, 470 U.S. 1, 15-16, 105 S.
1038, 1046-47 (1985) (stating that plain error applies only to "particularly egregi
errors" which "seriously affect the fairness, integrity or public reputation of jud
proceedings," and that plain error must be evaluated "by viewing such a claim again
entire record" (internal quotations omitted)); Government of V.I. v. Parrilla, 7 F.
1097, 1100 (3d Cir. 1993) ("`Plain error' analysis requires a case-by-case determin
that includes examining factors such as `the obviousness of the error, the signific
the interest protected by the rule that was violated, the seriousness of the error
particular case, and the reputation of judicial proceedings if the error stands
uncorrected -- all with an eye toward avoiding manifest injustice.'" (quoting Unite
States v. Thame, 846 F.2d 200, 205 (3d Cir. 1988))); Government of V.I. v. Smith, 9
677, 681 (3d Cir. 1991) ("Plain errors are those that undermine the fundamental fai
of the trial and contribute to a miscarriage of justice," and courts are to be find
"sparingly." (internal quotation omitted)).
[0]The prejudicial nature of canine-alert evidence can manifest itself in various
proceedings in addition to trials on the merits -- for example, at suppression hear
investigating the existence vel non of probable cause to search based on a canine's
reaction to currency or in grand jury proceedings.

(6th Cir. 1993), <u>United States v. Six Hundred Thirty-Nine Thousand Five Hundred &</u>

<u>Fifty-Eight Dollars ($639,558) in United States Currency</u>, 955 F.2d 712, 714 n.2 (D.

1992), and elsewhere, which collectively persuade me that a substantial portion of

States currency now in circulation is tainted with sufficient traces of controlled

substances to cause a trained canine to alert to their presence.  Although the mou

evidence and studies were not made part of the record at trial and thus are not di

before us on review, I set them forth in the margin.[0]

---

[0]The Sixth Circuit wrote:

> [T]he evidentiary value of a narcotics detection dog's alert has recently been
> into question.  As noted by one district court, "[t]here is some indication th
> residue from narcotics contaminates as much as 96% of the currency currently i
> circulation."  <u>United States v. $80,760.00 in United States Currency</u>, 781 F. S
> 462, 475 & n.32 (N.D. Tex. 1991)[, <u>aff'd</u>, 978 F.2d 709 (5th Cir. 1992)].  See
> <u>Use of Drug-Sniffing Dogs Challenged:  ACLU Backs Complaint by Men Whose Pocke</u>
> <u>Was Seized</u>, WASH. POST, May 6, 1990, at D1 ("I would not want to walk into cour
> rely exclusively on a dog sniff for a forfeiture of money," said Charles S. Sa
> Chief of the U.S. Justice Department's Narcotic and Dangerous Drugs Section.
> are a lot of guys out there that have shown that there is a trace [of] dope on
> of money out there.  And for that reason alone, I'd want more than just the do
> <u>Dirty Money</u>, UNITED STATES BANKER, October 1989, at 10 (discussing study by Lee H
> Chief Toxicologist for Florida's Dade County Medical Examiner's Office that 97
> bills from around the country tested positive for cocaine; noting also that ba
> play a role in spreading the cocaine traces when tellers count and recount mo
> rubbing one bill against another). Thus, a court should "seriously question[]
> value of a dog's alert without other persuasive evidence . . . ."  <u>$80,760.00</u>,
> Supp. at 476 (and cases cited therein).

985 F.2d at 250 n.5.  The District of Columbia Circuit surveyed similar evidence:

> In order to blunt the implications of [drugs being found on the money, the def
> called an expert, Dr. James Woodford, who testified that 90 percent of all cas
> the United States contains sufficient quantities of cocaine to alert a trained
> Officer Beard, the dog handler, suggested on the basis of hearsay that the num
> lower, near 70 percent.  (There is at least one study indicating that up to 97
> percent of all bills in circulation in the country are contaminated by cocaine
> an average of 7.3 micrograms of cocaine per bill.  <u>Crime and Chemical Analysis</u>
> SCIENCE 1554, 1555 (1989).)

. . . It has been estimated that one out of every three circulating bills
been involved in a cocaine transaction. R. SIEGEL, INTOXICATION 293 (1989). Coca
attaches -- in a variety of ways -- to the bills, which in turn contaminate ot
they pass through cash registers, cash drawers, and counting machines at banks
commercial establishments, id.; Crime and Chemical Analysis, supra, at 1555.
Woodford testified that, as a result, bills may contain as little as a million
gram of cocaine, but that is many times more cocaine than is needed for a dog
alert. . . . See generally Taslitz, Does the Cold Nose Know? The Unscientific
the Dog Scent Lineup, 42 HASTINGS L.J. 15, 29 & n.71 (1990).

955 F.2d at 714 n.2 (some citations omitted). Many other sources have, apparently
exception, reached the same conclusion. See United States v. Mendez, 827 F. Supp. 1
1283 (S.D. Tex. 1993) ("Dogs alert to the odor from trace amounts in bags and money
unsuspecting, innocent persons from drugs long gone."); Jones v. United States Drug
forcement Admin., 819 F. Supp. 698, 719-21 (M.D. Tenn. 1993) (recognizing that "a g
chorus of courts [is] finding[] the evidence of the narcotic-trained dog's `alert'
currency is of extremely little probative weight" and concluding that "the continue
reliance of courts and law enforcement officers on dog sniffs to separate `legitima
currency from `drug-connected' currency is logically indefensible") (citing a 1987
memorandum by a DEA scientist, admitted into evidence, revealing that "one-third of
bills in a randomly selected sample were contaminated with . . . cocaine"); United
v. $87,375 in United States Currency, 727 F. Supp. 155, 160 (D.N.J. 1989) (stating
the defendant's expert witness concluded "[a]fter analyzing random samples of curre
varying denominations from banks throughout the Northeast . . . that all the bills
tained cocaine residue"); Mark Curriden, Courts Reject Drug-Tainted Evidence, 79 A.
22 (Aug. 1993) (quoting forensic chemist Dr. James Woodford of Atlanta as stating t
"[t]he probability that every single person in the United States is carrying drug-t
money is almost certain" and reporting that a 1987 study by a Drug Enforcement Agen
scientist found that one-third of all money at the federal Reserve Building in Chic
tainted with cocaine); John Dillin, Law Would Reign in Agents from Seizing Money, C
SCI. MONITOR, June 17, 1993, at 2 (reporting that Rep. Hyde stated that "97 percent o
currency now carries at least a trace of narcotics"); Howard R. Reeves, Dusty Money
ORLANDO SENTINEL TRIB., July 1, 1992, at A14 ("According to a May 1992 newsletter circu
by the Hartz Group Inc. and prepared by the International Health Awareness Center o
Kalamazoo, Mich., 97 percent of all paper money in the United States contains trace
cocaine."); Jeff Brazil & Steve Berry, You May Be Drug Free, But Is Your Money?, OR
SENTINEL TRIB., June 15, 1992, at A6 (reporting that all used bills taken from promin
community leaders -- including a circuit judge, the police chief, a state senator,
mayor, a college president, and others -- tested positive for cocaine, and that
toxicologist Wayne Morris, a former crime-laboratory specialist for the Florida Dep
of Law Enforcement, has testified in hundreds of criminal cases that as much as 90
of currency in some cities tests positive for cocaine); Virtually All U.S. Paper Mo
Contaminated with Cocaine, ALBANY TIMES UNION, Aug. 12, 1991, at A-8 (discussing studi
two private institutions indicating over 80% of U.S. currency is tainted with cocai

If any of the many studies cited above is valid, then the fact that a dog aler[...]
a large number of bills in United States currency which has circulated in a major
metropolitan center (at which the studies are directed) is meaningless and likely c[...]
unfairly prejudicial, see FED. R. EVID. 403, and evidence thereof should have been
excluded.  Although having been directed to many of the studies I have cited by Car[...]
brief, the government in its brief has not disputed the validity of any of the stuc[...]
mentioned above.  It has not pointed to any countervailing studies -- whether of re[...]
otherwise -- which contradict them, or mustered any arguments pointing to the relev[...]
its canine-alert evidence, despite shouldering the burden of establishing its relev[...]

It is thus my considered opinion that the fact that numerous studies by govern[...]
and private agencies, studies which stand unrefuted, strongly suggest that a traine[...]
canine will alert to all bundles of used currency does not permit the jury to draw [...]
reasonable inference that the person in prior possession of such currency was a dru[...]
trafficker or associated with one.[0]  Indeed, I am inclined to the view that the info[...]

Nation's Money Supply Dusted with Cocaine, UNITED PRESS INT'L, Dec. 13, 1989 (availabl[...]
LEXIS' News Library) (reporting that tests by Toxicology Testing Service Inc. of Mi[...]
indicated 10 of 11 bills nationwide and all 24 randomly selected bills from Orange [...]
Cal. tested positive for cocaine, and that Steven Fike of the U.S. Customs Laborato[...]
San Francisco stated that 70% of the bills he tests contain detectable traces of cc[...]
residue); cf. In re Daniels, 478 N.W.2d 622, 623 (Ia. 1991) (holding that a "dog's [...]
detection of the odor of a controlled substance [on currency] did not provide subst[...]
evidence connecting the money with drug dealing"); Commonwealth v. Giffin, 407 Pa. [...]
15, 25, 595 A.2d 101, 106 (1991) (holding that a dog's alert to seized funds did nc[...]
establish that the currency was "more likely than not derived from or used to facil[...]
violation of the Controlled Substances Act" by the owner).

[0]The majority opines, without any support whatsoever, that "positive alerts by trai[...]
drug sniffing dogs indicate that much of the money likely was used in drug transact[...]
Maj. Op. at 22-23.  It may be true, although given the aforementioned studies which [...]
how traces of drugs may be transferred between bills it is doubtful, that "much of [...]
money likely was used in drug transactions."  But what the evidence obviously fails[...]
describe is who was involved in those drug transactions and who knew about them.  I[...]
person standing before me in the grocery line pays for his or her goods with cash e[...]

8

now available establishes a strong presumption against the admissibility of eviden[ce]

canine's alert to currency, and that the government can rebut that presumption only [if it]

first clearly and convincingly establishes, outside the presence of the jury, the

in a drug sale, and I receive that cash as change, then I am clearly in possession [of]
"money . . . used in drug transactions," but I have not thereby become a drug traff[icker]
(or a money launderer for that matter). Drug-tainted money is passed around as qui[ckly]
as effortlessly as money not tainted with illegal drugs, and given the vast amounts [of]
cash apparently consumed by the black market in drugs it is easily conceivable that[, as]
the studies indicate, between 70%-97% of all used bills come tainted with traces of
illegal drugs.

It would seem that the odds that out of the $180,000 in cash exchanged for the
government's $100 bills, assuming it was composed of an average of $10 bills (i.e.,
assuming about 18,000 bills), none was _ever_ (i.e., since being printed) exposed to [drugs]
(whether directly or by virtue of contact with tainted money or sorting equipment) [are]
exceedingly low. Even if I discount as grossly excessive the statistics cited in t[he]
studies, which indicate that between 70%-97% of U.S. currency is contaminated with
sufficient traces of drugs for a trained canine to alert to, and assume that only 1[% of]
currency meets that test, the odds that none out of a random collection of 18,000 b[ills of]
U.S. currency contains traces of illicit drugs are so small (less than 1 in $10^{78}$ -- [by]
comparison, there are only about $10^{57}$ atoms in the sun) as to be equivalent to zer[o].

The dog handlers testified in unison at trial that they could not tell how man[y bills in a]
bag of bills were tainted, that dogs would alert if only one out of a thousand bill[s was]
tainted, and that there was no way of knowing when a particular bill became tainted[.]
Eichmann at 95-97; Hamlers at 118-19, 121; Kinsky at 97-98. Against this backgrou[nd, the]
grossly prejudicial potential of canine-alert evidence is readily apparent. I also [find]
that the government witness' concession that a dog could alert to one tainted bill [in a]
bundle of one thousand untainted bills completely discredits the majority's specula[tion]
that the canines' positive alerts indicated that "_much_ of the money likely was use[d in]
drug transactions." Rather, it would appear from the government's own witnesses th[at]
if just a few of the thousands of bills sniffed were "used in drug transactions" th[e]
dogs would have alerted to the whole bundle.

The facts would have been different if the government had randomly selected ou[t]
several hundred of the bills and had subjected each one individually to a canine. [It]
could establish within a degree of probabilistic certainty what percentage of the b[ills in]
the whole bundle contained traces of drugs. If as a statistical matter that percen[tage]
departed significantly from the percentage of used bills in general circulation to [which]
the canines respond, the evidence might bear some relevancy and with proper instruc[tion]
might not be prejudicial. Alternatively, the government could have washed the bill[s and]
obtained exact measurements of the amount of drug traces the bills contained, and c[ompared]
this quantity statistically to that found to taint currency in general circulation.[ But]
as the test was conducted, the government's proof is fatally and prejudicially flaw[ed.]

9

relevance and non-prejudicial character of the offered evidence.  Since the governm

failed its burden of showing the relevance of its evidence, in order to protect the

"public reputation of judicial proceedings," <u>United States v. Young</u>, 470 U.S. 1, 15

105 S. Ct. 1038, 1046-47 (1985), I would exclude that prejudicial and irrelevant ev

from our consideration of this case.[0]

---

[0]The majority acknowledges the studies, but declines to consider them as evidence b
they do not satisfy the standard set by Federal Rule of Evidence 201 for judicial n
of adjudicative facts.  <u>See</u> Maj. Op. at 14 n.3.  I see the studies from a different
perspective:  I am inclined to the view that they are adequate for legislative
factfinding, which is not governed by Rule 201.  That is, I do not see them as evid
whether the canine alert evidence was relevant <u>in this case</u>, but as evidence of whe
evidence of a canine's alert to currency is <u>generally</u> admissible or probative.  For
purpose, the studies make sufficiently convincing reading for me to require the gov
to come forth with affirmative evidence of relevance in every case.  <u>See</u> <u>In re Asbe</u>
<u>Litig.</u>, 829 F.2d 1233, 1247 (3d Cir. 1987) (Becker, J., concurring) ("As Justice Ho
recognized long ago, `the court may ascertain as it sees fit any fact that is merel
ground for laying down a rule of law.'  To forbid such recognition would force cour
fashion laws without reference to reality." (citation omitted)), <u>cert. denied</u>, 485
1029, 108 S. Ct. 1586 (1988); <u>Bulova Watch Co. v. K. Hattori & Co.</u>, 508 F. Supp. 13
1328 (E.D.N.Y. 1981) (Weinstein, C.J.) ("A court's power to resort to less well kno
accepted sources of data to fill in the gaps of its knowledge for legislative and g
evidential hypothesis purposes must be accepted because it is essential to the judi
process."); FED. R. EVID. 201 -- advisory committee note.  <u>See generally</u> Michael J.
<u>Judicial Attention to the Way the World Works</u>, 75 IOWA L. REV. 1011, 1017-18 (1990);
E. Keeton, <u>Legislative Facts and Similar Things:  Deciding Disputed Premise Facts</u>,
MINN. L. REV. 1, 8-10, 14-28 (1988); Ann Wollhandler, <u>Rethinking the Judicial Recept</u>
<u>Legislative Facts</u>, 41 VAND. L. REV. 111, 112-14 (1988); Kenneth C. Davis, <u>An Approac</u>
<u>Problems of Evidence in the Administrative Process</u>, 55 HARV. L. REV. 364, 402-10 (19
    Although I am driven to conclude that there is no reason to assign any weight
evidence, the majority apparently labors under the false assumption, for which ther
also no support in the record, that only currency which has been used by the immedi
preceding possessor in a drug transaction is likely to contain traces of drugs.  In
words, the majority is <u>sub silento</u> engaged in similar legislative factfinding, alth
has nothing to support its facts other than unfounded and baseless assumptions.  In
particular, the majority impliedly assumes that only a very small portion of curren
circulation is tainted with drugs -- since even if only 1 in 10,000 bills in genera
circulation contains enough drug traces for a trained canine to alert to, the proba
that in a random collection of 18,000 bills there would be at least one such bill i
approximately 84%.  Beyond that, the majority also assumes that only drug trafficke

10

However, I think that the other evidence and the nature of Carr's conviction r

the admission of that evidence harmless error in this case.  In particular, the can

sniffing evidence appears to have been relevant only to the issue of whether the cu

Gonzalez exchanged for the government's fresh $100 bills in fact represented the pr

of drug trafficking.[0]  I believe that the other evidence proffered by the governmen

including the fact that the money originated from Gonzalez, who was convicted of dr

trafficking, sufficed to establish that the large amount of cash in fact represente

proceeds of drug trafficking.[0]  In sum, although I think admission of the canine al

evidence was not plain error in this case under Federal Rule of Criminal Procedure

I think for purposes of appellants' sufficiency of the evidence challenge we should

give the evidence the weight due it -- absolutely none.

---

their co-conspirators are in possession of such tainted money.  As far as I can tel
assumption is based on a belief, unsupported by rhyme or reason, in the chemical pu
the money supply.

[0]The majority, without providing any support for or explanation of its reasoning, s
conclude that the mere fact that the money in fact represented the proceeds of drug
trafficking --a conclusion it draws, I believe quite erroneously, from the canine s
evidence -- is relevant evidence to prove that Carr knew that it did.  Maj. Op. at
Even if I could sign on to the majority's assumption about the probativeness of car
sniffing evidence, the logical connection between this circumstantial evidence and
knowledge escapes me.  The majority cannot be suggesting that because the dogs smel
drugs on the money so Carr could have too, as Carr was not present when Gonzalez ex
his tainted cash with the government informant's cash, and the cash Carr actually c
had no drug traces on it.  The fact that some money which Carr never had contact wi
once used in drug trafficking, a fact which only a canine could detect (assuming fo
moment the evidence of a canine alert is probative on that point), has no bearing o
Carr believed about the origin of the (different) money which he later was caught
transporting.  The majority's reasoning is tantamount to using the fact that a radi
stolen circumstantially to prove that the defendant knew he or she was purchasing s
goods.

[0]I agree with the majority that there was ample evidence of drug trafficking adduce
respect to Cardona.  See Maj. Op. at 13-16.

11

III.   CARR'S GUILT UNDER THE PROPER READING OF § 1956(A)(2)(B)(I)

Under my reading of § 1956(a)(2)(B)(i), I think that even after drawing all reasonable inferences in favor of the government, the jury could not properly have Carr guilty beyond a reasonable doubt on the charges contained in Count 21 of the indictment.  I base my conclusion on the relevant facts that are set forth in the majority's opinion at pages 5-8, 20-22, 24 (that is, all the facts except the ones pertaining to canine alerts), which I will briefly repeat here.

There is evidence in the record of Carr's repeated other short trips to the Ca Islands and Colombia, trips which he took in close proximity to the government's ex of $100 bills for cash in smaller denominations and only after making a stop at the agency, and of the passport incident occurring on May 2, 1990.  From this amalgamat evidence, the jury could legitimately have inferred that on several other occasions carried cash from the United States to a foreign country, including Colombia.  The evidence also established that Carr was knowingly transporting a large amount of ca ($186,000), that Carr lied to the customs agent about the amount and source of the was transporting, and that he phoned Mrs. Gonzalez after the government confiscated money to report the loss.  These facts allowed the jury to conclude, as it did, tha illegally, in violation of the currency reporting laws, knowingly transported cash the country.

But I think that all these facts in combination fall shy of establishing that was knowingly a money launderer, as there is no evidence indicating that Carr knew cash represented the proceeds of drug trafficking.[0]  Although Carr obtained the cas

---

[0]The majority posits that the jury may have convicted Carr of money laundering on t alternative ground that Carr believed that the money represented the proceeds of il money laundering.  See Maj. Op. at 20-21.  The problem with this theory is that the

(subsequently convicted) drug trafficker Gonzalez, there is no evidence Carr was an

but a business acquaintance of Gonzalez's[0] or that he knew of Gonzalez's illicit

activities. Specifically, the government introduced no evidence that Carr was aware

the money represented the proceeds of drug trafficking, as opposed to, for example,

illegally skimmed from Gonzalez's two legitimate businesses, or money that Gonzalez

attempting to smuggle to Colombia on behalf of his Colombian friends who were avoid

United States or Colombian taxes or on behalf of illegal immigrants sending their w

their families in Colombia.  None of the probative circumstantial evidence the majo

cites -- the frequent trips, the passport incident, the phone conversations -- alon

combination has the "logical and convincing connection," United States v. Casper, 9

---

government did not charge it in the indictment, did not adduce any evidence of it,
argue it to the jury, and did not raise it as a basis for affirmance on appeal.  Cf
United States v. Campbell, 977 F.2d 854, 857 (4th Cir. 1992) ("All of the Governmer
evidence was designed to show that [the defendant] knew that Lawing was a drug deal
There is no indication that the jury could have believed that Lawing was involved i
form of criminal activity other than drug dealing."), cert. denied, 113 S. Ct. 1331
(1993).  In fact, the government specifically charged in the indictment that Carr k
that the cash represented the proceeds of drug trafficking, an indictment which was
amended to rid it of that "surplusage" (if indeed that is what it was).  The majori
seems to cull its theory from Carr's brief on appeal, which mentions it only to obs
that the government had not pursued it.

Insofar as the majority fashions new grounds of criminal liability on appeal,
departs from established and conventional norms of notice and due process apropos c
convictions. See U.S. CONST. amend. VI.  Issues of notice and due process aside, I c
see how the jury could have convicted Carr of "knowing" the money represented the p
of money laundering when the jury was not instructed that money laundering is a "fe
under state, federal, or foreign law," Maj. Op. at 19, for purposes of § 1956(a)(2)
and when the government did not press that argument upon it.

[0]The majority's suggestion about an "intimate relationship," Maj. Op. at 21-22 & n.
not supported by the record.  While there was evidence that Carr went on numerous b
trips with Gonzalez, there was no evidence that the two were close friends or that
confided in each other.  In fact, on the July 11 trip, the only one about which the
any evidence relating to their precise travel arrangements, the two did not even si
the same section of the airplane.

416, 422 (3d Cir. 1992), to drug trafficking needed to elevate the drug trafficking

of what Carr knew over any other theory.

The majority today allows a jury to speculate on the mere basis of a short tri

Colombia with a large amount of cash not only that the carrier _is_ a money launderer

drug trafficking proceeds, but that he _knows_ he is.  Especially in a criminal case,

however, it is improper to speculate about what the defendant knew.  The Constituti

requires the government to prove each element of the offense beyond a reasonable do

not merely to a reasonable suspicion.  In short, the evidence did not establish bey

reasonable doubt that Carr knew the funds represented proceeds from drug traffickin

The district judge did give the jury a charge on willful blindness.  See Unite

States v. Caminos, 770 F.2d 361, 365 (3d Cir. 1985) (holding that willful blindness

when "the defendant himself was subjectively aware of the high probability of the f

question").  But Caminos, in which we concluded that the willingness of two indivic

pay over $1,000 to have the defendant deliver a $60 Brazilian wood carving was suff

to sustain a finding of defendant's willful blindness to the fact that there was so

illicit hidden in the carving, is distinguishable.  There the charge on willful bli

was quite broad, applying to "willful blindness to the existence of facts which ind

that there is a high probability that _some_ forbidden or illegal substance may be co

therein," id. at 366 (emphasis supplied), whereas here the government had to prove

Carr knew the money represented the proceeds of "specified unlawful activity."  Car

easily have believed merely that he was transporting the cash in violation of the c

reporting laws instead of laundering it, whereas (given the broad wording of the wi

blindness charge) no such alternative explanation existed in Caminos.[0]  Thus it has

---

[0] I note also that the arguments raised here were not discussed in Caminos.

14

been established beyond a reasonable doubt that Carr was subjectively aware of a hi

probability that the money he was transporting represented the proceeds of drug

trafficking.

For the foregoing reasons, I respectfully dissent from the judgment insofar as

affirms Carr's conviction on Count 21.